EQUITABLE LIFE INSURANCE CO. OF IOWA *v.* HALSEY, STUART & CO.

No. 291. Argued January 15, 16, 1941.—Decided March 3, 1941.

*Mr. Joseph G. Gamble,* with whom *Mr. Alden B. Howland* was on the brief, for petitioner.

*Mr. Edward R. Johnston,* with whom *Mr. Floyd E. Thompson* was on the brief, for respondent.

MR. JUSTICE STONE delivered the opinion of the Court.

Petitioner brought this suit in the District Court for Northern Illinois to recover damages suffered by reason of alleged fraudulent statements made by respondent's agents which induced petitioner to purchase of respondent a large number of Longview (Washington) local improvement bonds. The trial to a jury resulted in a verdict and judgment for petitioner in the sum of $66,150. The Court of Appeals for the Seventh Circuit reversed on the ground that some of the untrue statements, on the faith of which petitioner had purchased the bonds, were within the protection of the "hedge clause" which appeared in a circular by which respondent had offered the bonds for sale to petitioner. The clause read:

"All statements herein are official, or are based on information which we regard as reliable, and while we do

not guarantee them, we ourselves have relied upon them in the purchase of this security."

The court found that another untrue statement contained in a letter written by respondent's agent to petitioner was "carelessly made," but, taken alone, was too trivial in its effect in inducing petitioner to purchase the bonds, to support the verdict. · It also held that there was no breach of legal duty on the part of respondent or its officers in their failure to reveal to petitioner facts known to respondent indicating that a financial statement of a guarantor of the bonds, submitted to petitioner by respondent's agent, on the faith of which petitioner had bought the bonds, did not truly represent the financial condition of the guarantor. We granted certiorari, 311 U. S. 626, upon a petition which asserted the failure of the court below to follow state law in its rulings, the questions presented being of public importance because they involve the relation of the federal courts to the states.

We summarize briefly the evidence submitted to the jury which bears on the contentions made before us. Respondent is a large dealer in bonds and securities, with an office in Chicago. Petitioner is an Iowa corporation having its office and principal place of business in Iowa where the transactions resulting in the sale of the bonds in question took place. In May, 1930, respondent through an agent offered to sell petitioner a quantity of the bonds of the Longview local improvement districts. The offering was by printed circular issued by respondent on April 7, 1927, which described the bonds as payable from proceeds of special assessments to be levied upon the benefited properties and stated that their payment was guaranteed principal and interest by Long-Bell Lumber Company, whose balance sheet for the year ending December 31, 1926, was printed in the circular. The circular stated—

"Longview is situated about 133 miles south of Seattle at the confluence of the Columbia and Cowlitz Rivers. It has a frontage of 7¼ miles on the former, and is a port of call for ocean-going vessels midway between Portland and the Pacific Ocean. . . . Because of its natural advantages and proximity to the timber stands of the Long-Bell and Weyerhaeuser interests, Longview was selected as the site for the vast lumber manufacturing plants of these companies. The present output of the Long-Bell plants is 1,800,000 board feet per day. The Weyerhaeuser plants are under construction. Manufacturing plants have also been erected by other concerns, including the Longview Concrete Pipe Company, the Pacific Straw Paper & Board Company, the Magor Car Corporation, the Standard Oil Company, Longview Paint & Varnish Company, and the Central Mill Works. The first unit of the plants of the Longview Fibre Company, to cost 2½ million dollars, is now well under way." The circular contained the "hedge clause" which has already been quoted.

In making the offering, respondent's agent also informed a vice president of petitioner that the bonds were secured by assessments on properties in the City of Longview and as additional security carried the full and complete guarantee of the Long-Bell Lumber Company which was a very large, long established company doing business in the south and west; and that Local Improvement Districts.Nos. 11 and 19, against which most of the bonds were issued, were practically co-extensive with the limits of the city.

After reading the circular petitioner's vice president requested of respondent's agent additional information about Longview and the property there and about the Long-Bell Lumber Company, which he supplied in a number of documents. One was a booklet issued by the

Longview Company, a subsidiary of Long-Bell Lumber Company, engaged in selling Longview real estate. The booklet showed a map on which the mills of Longview Lumber Company, the property of the Weyerhaeuser Timber Company and the City of Longview appeared to extend to and along the northerly side of the Columbia River. The map bore a legend reciting that it "is intended to show in a general way the relation of the various parts of the city site to each other, and location of the city in relation to water, railroad and highway transportation facilities." Another document was advance proof of an advertisement of the Longview Company, published in the Saturday Evening Post. It contained an illustration of extensive manufacturing plants, beneath which it was stated "The thoroughly modern electrically operated manufacturing plants shown in the above sketch are in Longview, Wn. They produce 1,800,000 feet of Douglas fir lumber a day. The buildings cover 72 acres. Six ocean-going freighters can load at one time at the Long-Bell docks." Another document was a booklet issued by the Longview Chamber of Commerce containing statements from which it could reasonably be inferred that the manufacturing plants of the Long-Bell Lumber Company and the Weyerhaeuser Timber Company were within the City of Longview and that the latter was on the Longview waterfront along the Columbia River.

Still another document, which will presently be discussed, was the published balance sheet for the year ending December 31, 1929, of the Long-Bell Lumber Company. Respondent's sales manager, on May 15, 1930, also wrote to petitioner's vice president a letter offering the first $100,000 of bonds purchased by petitioner, saying, "We believe you have before you practically all the data covering this issue of bonds," and "you observe, of course, that this city has no funded debt other than these

improvement bonds and that the original debt has been materially reduced through retirement and maturity."

It is not seriously contended here that petitioner did not purchase the bonds on the faith of the statements which we have detailed and others of similar character, nor is it denied that the Long-Bell, Weyerhaeuser, Longview Fibre and Standard Oil Company plants were all outside the city limits of Longview and that none of those properties were subject to assessments in any of the improvement districts. The mill properties were located between the Columbia River and the limits of the City of Longview. The city never had a frontage of 7¼ miles upon the Columbia River and no such frontage at all except for a distance of about 200 yards adjacent to the Longview dock and not within the improvement districts. Substantially all of the land included within the local improvement districts of Longview was also included within a diking district known as Cowlitz County Consolidated Diking District No. 1, which in May, 1930, when the negotiations for the sale of the bonds to petitioner took place, had outstanding bonds in the sum of $2,554,000 payable from the proceeds of special assessments to be levied upon substantially all lands within the improvement districts. Respondent had purchased the entire issue of diking bonds from the Long-Bell Lumber Company in 1925 and later resold them to the public.

At the trial a vice president of respondent, called by petitioner as an adverse witness, testified that in purchasing the local improvement district bonds respondent gave no consideration to the special assessments against Longview real estate; that respondent regarded Long-Bell Lumber Company's guarantee as the sole justification for handling the bonds and would not have handled them without the guarantee. None of these facts detailed by the witness were communicated to petitioner in advance of the sale of the bonds.

A close business relationship had existed between respondent and Long-Bell Lumber Company for some years before 1930. It had purchased from the Lumber Company and sold to customers $25,000,000 of its first mortgage bonds between 1922 and 1926, and in some of its offerings it had been referred to as the "fiscal agent" of the Long-Bell Lumber Company. In 1926 it had purchased from the Lumber Company and resold $3,250,000 of its bonds. In the years 1925, 1926 and 1927 it purchased from the Lumber Company and later resold more than $3,000,000 of the Longview local improvement district bonds.

The Long-Bell Lumber Company balance-sheet for 1929, to which we have referred, disclosed total assets of more than $116,000,000 with current assets of cash and inventories amounting to more than $15,000,000. Current liabilities were less than $8,000,000 including bank loans of $4,000,000. The funded debt of Long-Bell and all subsidiaries was less than $42,000,000, and capital and surplus were shown in excess of $59,000,000.

There was much evidence from which the jury could have found that the Lumber Company, prior to the first sale of the bonds to petitioner in May, 1930, had, by more or less regular reports, kept respondent closely advised of developments at Longview and generally of its financial condition. Among the data transmitted were documents produced from respondent's files showing that in 1927 sales of Longview real estate by the Lumber Company's real estate subsidiary had practically ceased; that during 1928 properties already sold were being taken back on the forfeiture of installment sales contracts, and that in April and May of that year forfeitures and repurchases in number and valuation of properties equalled new sales; that in 1928 respondent conducted market operations in the securities of the Lumber Company and asked $75,000 as compensation

for bringing about an improvement in their market quotations.

During the early months of 1930 and before the first sale of bonds to petitioner, which occurred on May 17th, there were frequent communications of information from the Long-Bell Lumber Company to respondent from which the jury could have found that respondent was advised of the progressive financial deterioration and loss of credit of the Long-Bell Lumber Company. These included discussion of an attempt to consolidate the Long-Bell Company with other lumber producers in the effort, as stated by Long-Bell's officers to respondent, "to meet quickly an acute and distressing situation"; efforts to procure loans and to convert Long-Bell property into cash; "to strengthen the Lumber Company's current financial condition by converting physical assets into working capital to meet current requirements"; unsuccessful efforts in March and April to market secured bonds and note issues of the Long-Bell Lumber Company, unsuccessful efforts by respondent in May to secure financing for Long-Bell by New York banking houses. There was evidence from which the jury could have found that respondent had been advised by the Long-Bell Company, that the officers of the Chase National Bank of New York and a large St. Louis bank had withdrawn and refused to renew the Long-Bell Company's line of bank credit and that the Chase Bank had advised strengthening of the Lumber Company's current financial position, and had suggested the formation for credit purposes of a subsidiary corporation to which the Long-Bell could transfer its liquid assets for purposes of borrowing operations. This advice was carried into effect in October, 1930. None of these circumstances showing the changed financial condition of the Long-Bell Lumber Company after its December 31, 1929 statement or any of the information of respondent with

respect to them were revealed by respondent or known to petitioner before purchasing the improvement bonds.

Petitioner purchased from respondent $353,000 of the bonds, $100,000 on May 17, 1930, $26,000 in September, $211,000 in October, $13,000 in January, 1931 and $3,000 in February. Of these, $279,000 were bonds of districts 11 and 19, which were the two districts which embraced substantially the whole City of Longview. In 1934 the Long-Bell Lumber Company filed a petition for reorganization under § 77B of the Bankruptcy Act. By the decree in the reorganization proceeding the Lumber Company was relieved of its guarantee of the improvement district bonds, the petitioner receiving 8 and 4/10ths shares of common stock in the reorganized corporation in lieu of the guarantee on each $1,000 bond.

Petitioner's case as submitted to the jury was in substance that it had been induced to purchase the bonds by untrue statements knowingly or recklessly made by respondent's officers and agents as follows: (1) That the extensive mill properties of the Long-Bell Lumber Company, the Weyerhaeuser Timber Company, the Longview Fibre Company and others were located in Longview and subject to assessment in Local Improvement Districts Nos. 11 or 19, the limits of which were substantially co-extensive with the limits of the city; (2) that Longview had a frontage of 7¼ miles upon the Columbia River which, if true, would locate the mill properties within the corporate limits; (3) that the improvement bonds were the only bonds constituting a charge or lien upon the lands in the improvement districts of the city; and, finally, (4) that respondent's officers and agents had in May, 1930, made representations of the strong financial position shown in the 1929 balance sheet of the Long-Bell Lumber Company which had guaranteed the improvement bonds, without disclosing to petitioner the knowledge which it then had or later acquired before

the sale of the bonds, that the Long-Bell Company was in fact in a declining and precarious financial condition.

The Court of Appeals held that the various statements and information given by respondent's officers and agents, after respondent's offering circular had been submitted to petitioner, were substantially the same as those made in the circular itself and therefore were under the protection of the hedge clause which had been printed in the circular. Stipulations by which one attempts to avoid the consequences of false statements fraudulently or recklessly made are strictly construed in the Iowa courts. *Jordan* v. *Nelson,* 178 N. W. 544. We are cited to no Iowa authority to the effect that such a clause applies or affords protection to any except the statements to which it refers. But we assume for present purposes, without deciding, as the Court of Appeals held, that the hedge clause extended its protection to later statements made by respondent like those contained in the circular. But in reaching its conclusion the court overlooked the fact that the documents and statements which followed the submission of the circular to petitioner were in response to a request by petitioner for additional information and contained items of information not found in the circular.

Among them was the December 31, 1929, financial statement of the Long-Bell Lumber Company, the advertising map bearing a legend indicating the city's frontage on the river and the location of the taxing districts within the city limits, other advertising material containing pictures indicating the location of the Long-Bell and other plants within the city limits, and the statement made to petitioner by respondent's sales manager that the city, which was co-extensive with the improvement district, had no funded debt. The court also failed to consider the question whether, under Iowa law, the

hedge clause afforded to respondent protection from untrue statements recklessly made, whether the statements in the circular and others later submitted to petitioner were recklessly made, and whether the hedge clause itself contained statements known to respondent to be untrue and had a material influence in inducing petitioner's purchase of the bonds.

It is obvious that the jury could have found that statements having persuasive influence in promoting the sale of the improvement bonds to the petitioner were: the statement as to the location along that waterfront and within the Improvement District of extensive manufacturing plants which would thus be subject to assessment for payment of the bonds, the statement that the city had no funded indebtedness other than the improvement bonds, and the representations as to the strong financial position of the Long-Bell Lumber Company which was guarantor of payment of the bonds. If, as the jury found, petitioner relied on these representations to its injury, it is immaterial, as appears to be conceded, that petitioner did not make its own investigation to ascertain whether they were true. *Gardner* v. *Trenary,* 65 Iowa 646; 22 N. W. 912; *Creamer* v. *Stevens,* 192 Iowa 920; 185 N. W. 581; *Ford* v. *Ott,* 186 Iowa 820; 173 N. W. 121.

The trial court correctly charged the jury in accordance with the Iowa decisions, in substance, that as a prerequisite to a verdict for petitioner, it must find that the representations in question were known by respondent to be false or were made as true with no reasonable ground for believing them to be true, but that if they were believed by respondent to be true and were made without reckless disregard as to their truth or falsity, and without intention to deceive petitioner, petitioner could not recover. The question of respondent's recklessness was thus submitted to the jury and we think properly so

upon the evidence. *Hanson* v. *Kline,* 136 Iowa 101; 113 N. W. 504; *Davis* v. *Central Land Co.,* 162 Iowa 269; 143 N. W. 1073; *Haigh* v. *White Way Laundry Co.,* 164 Iowa 143; 145 N. W. 473.

Respondent's witness, a vice president in charge of its municipal bond issues, testified that he assembled the data appearing in the circular submitted by respondent to petitioner without his ever having visited the City of Longview and without making any inquiry of the city officials or representatives as to the truth of the matters stated in the circular. So far as appears no such inquiry was made by respondent or in its behalf before the sale of the bonds to petitioner. The witness stated that he had obtained the information from the offices of the Long-Bell Lumber Company at Kansas City and Longview; that he had submitted the circular when prepared to the general counsel of the Long-Bell Lumber Company at Kansas City, who had approved it. Whether counsel had any personal knowledge of the matters stated in the circular, or what he stated to respondent with respect to it, does not appear. The information about the $7\frac{1}{4}$ mile frontage of the city on the Columbia River and the location of the Long-Bell, Weyerhaeuser and other plants within the limits of the improvement districts was compiled by the witness from advertising copy suggested by the advertising manager of the Long-Bell Lumber Company. His recollection was that some of this information came from an address made "by one of the Long-Bell land agents at Longview."

No testimony was forthcoming to show that any executive officer of the Long-Bell Lumber Company gave assurances of the truth or accuracy of this information, or that any of them believed it to be true. When the witness sought this information in October, 1930, he promptly obtained the correct information from the Long-

view tax authorities. The evidence is conflicting whether this information ever was communicated to petitioner, and if so whether before its October purchase of the bonds. Petitioner's testimony was that it first acquired the information in June, 1931. Two of respondent's vice presidents had visited Longview two or more times in 1922 and 1924 in connection with the purchase by respondent of Long-Bell bond issues. Both testified as witnesses, but neither of them denied knowledge of the location of the corporate limits of the City of Longview and of the mill properties. Another vice president in charge of purchases of municipal issues had made a trip to Longview in 1925 and while there had entered into a. contract with the Lumber Company for the purchase from it by respondent of the improvement bonds. He also arranged in that year for the purchase from Long-Bell Lumber Company by respondent of the diking district bonds, already referred to. This vice president, having died, did not testify, but there was testimony by his assistant and successor that the location of the diking district was ascertained by respondent at that time.

The only identified sources of respondent's information as to the location of the city on the river and the location of the manufacturing plants with respect to the taxing districts, were an advertising agent of the Long-Bell Lumber Company, a land agent acting either for the Long-Bell Lumber Company or its subsidiary, and a map with descriptive material printed on it appearing as a part of a published advertisement of the Longview Company, which promoted the real estate enterprise in Longview. None of this information was verified by any responsible official of the Long-Bell Lumber Company nor by any official or representative of the City of Longview, and no such verification appears to have been sought by respondent. We think it was for the jury to say whether statements resting upon such flimsy support,

made as the basis for a public offering of municipal bonds aggregating more than $3,000,000, were recklessly made, or were without reasonable basis for the assertion of their truth to prospective investors.

The court below thought the statement made by respondent's sales manager, despite the outstanding diking district bonds, that the city was without funded debt other than the improvement district bonds, was carelessly made but trivial in its effect in inducing the purchase of the bonds. But we cannot say that the trial court should not have left it to the jury to decide whether this statement was knowingly false or recklessly made, or whether in all the circumstances it materially influenced petitioner's purchase of the bonds. Moreover, we think that in all the circumstances of the case the trial court rightly left it to the jury to say whether in fact respondent in the course of its investigation, through its vice presidents or others, of issues of bonds totalling more than $30,000,000, issued either by the City of Longview or the Long-Bell Lumber Company or bearing its guarantee, became aware of the actual location of the properties in question.

Petitioner also insists that the jury could have found that the hedge clause itself was known by respondent to be untrue when made. The clause declared that the statements contained in the circular "are based on information which we regard as reliable and . . . we ourselves have relied upon them in the purchase of this security." Yet, respondent's vice president in charge of municipal issues, who had prepared the offering circular, testified, without contradiction, "We bought and sold the bonds solely on the guarantee of the Long-Bell Lumber Company paying no attention whatever to the valuation of the lands upon which the assessments were laid." Upon this state of the record the jury could have found that the hedge clause itself was untrue and would mislead

prospective purchasers to the erroneous belief that Halsey, Stuart & Co. regarded the bonds as worthy investments on their merits either independently or in conjunction with the guarantee. It could have found also that its materiality was of added importance in influencing the sale of the bonds in view of the knowledge of respondent, not disclosed to petitioner, that the Long-Bell Lumber Company was already in financial straits.

While it is arguable, as the court below thought, whether in view of all the circumstances petitioner placed more or less reliance upon the obligations attaching to a municipal security on the one hand or upon the guarantee of the Long-Bell Lumber Company on the other, or whether it would have scrutinized more searchingly the guarantee had it known that respondent depended on that alone, these are arguments for the jury and not the court.

The court below held that the failure of respondent to reveal to petitioner its knowledge of the declining financial status of the Long-Bell Lumber Company, which respondent acquired in the early months of 1930, fell short of establishing fraud or breach of legal duty on its part. The court reached this conclusion on the grounds that there was no fiduciary relationship between respondent and petitioner; that the 1929 balance sheet of the Lumber Company was not shown to be an untruthful statement of the financial condition of the Company at that time; that respondent did not seek additional information as to the financial condition of the Company, and if it had done so could readily have ascertained its condition from other sources.

But we think that, under Iowa law, these factors did not, in the circumstances of this case, relieve respondent of the duty to speak. As we have said, petitioner was under no duty to make an independent investigation of the truth of respondent's statements if, as the jury found,

it relied on those statements in the purchase of the bonds. Respondent furnished the balance sheet in response to petitioner's request for information about the Lumber Company after emphasizing to petitioner the Company's guarantee of the improvement bonds and stating "we believe you have before you practically all the data covering this issue of bonds." From the evidence the jury could have found that the balance sheet was submitted to petitioner as one of the bases of the pending negotiation and as a representation, that it disclosed, so far as known to respondent, the financial condition of the Company, that notwithstanding such representation respondent then knew that the Company's financial condition had so steadily and seriously declined after the date of the balance sheet as to impair substantially the value of the guarantee, and that this statement of a half truth had materially assisted in the sale of the bonds to petitioner.

The trial court instructed the jury:

"It is the duty of one selling securities, who attempts to supply a prospective purchaser with facts concerning the issue, not only to state truthfully what he actually tells, but also not to suppress any facts within his knowledge which will materially change or alter the effect of the facts actually stated. To tell less than the whole truth may constitute a false and fraudulent representation. A partial and fragmentary disclosure of certain facts concerning an issue of securities, accompanied by the willful concealment of material facts which change the effect of the facts actually stated, is as much a fraud as an actual positive misrepresentation."

By this instruction and others of like tenor the court left the jury free to apply to the evidence the generally accepted doctrine adopted by the American Law Institute, Restatement of Torts, §§ 529, 551. Section 529 states:

"A statement in a business transaction which, while stating the truth so far as it goes, the maker knows or be-

lieves to be materially misleading because of his failure to state qualifying matter is a fraudulent misrepresentation."

Such a statement of a half truth is as much a misrepresentation as if the facts stated were untrue. The court's charge was in conformity to Iowa law as disclosed by its judicial opinions. See *Howard* v. *McMillen,* 101 Iowa 453; 70 N. W. 623; *Noble* v. *Renner,* 177 Iowa 509; 159 N. W. 214; *Foreman* v. *Dugan,* 205 Iowa 929; 218 N. W. 912. No argument made or authority cited here persuades us that the Supreme Court of Iowa would, upon the evidence presented, apply any different rule. See *Wichita Royalty Co.* v. *City National Bank,* 306 U. S. 103, 107; cf. *West* v. *American Telephone & Telegraph Co.,* 311 U. S. 223.

Respondent has raised numerous other questions which were not considered by the court below. This cause will therefore be reversed and remanded to the Court of Appeals for further proceedings not inconsistent with this opinion.

*Reversed.*