See also D.C., 51 F.R.D. 9.

Aaron **BERNSTEIN**, Executor of the Will of Louis Bernstein, Deceased, Plaintiff,

v.

Marcella Bernstein **BRENNER**, Defendant.

Civ. A. No. 3278–66.

United States District Court, District of Columbia.

Dec. 14, 1970.

Nicholas Zumas, Alan Kay, Andrew L. Frey, Washington, D. C., for plaintiff.

William D. Rogers, Jack Lipson, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GESELL, District Judge.

Litigation in this Court entitled "In re Estate of Morris Louis Bernstein, Louis Bernstein, Petitioner, v. Marcella Bernstein, Respondent, Administration No. 107514," was settled and dismissed "with prejudice" by a Consent Order entered October 8, 1964. The present action asks the Court to "rescind, set aside and render invalid" this final settlement. Testimony was taken on rescission commencing September 15, 1970, following extensive pretrial discovery. Numerous exhibits were received, and the record contains a stipulation of some undisputed facts. The issues in this essentially fact case have been fully briefed and argued. This Memorandum Opinion supplements Findings of Fact filed this date and contains the Court's Conclu-

sions of Law upholding the settlement and awarding defendant costs.

The issue in the prior probate litigation concerned title to numerous paintings created by a deceased artist, Morris Louis Bernstein, who had died intestate without children. Defendant Marcella Bernstein Brenner (administratrix and hence respondent in the administration proceeding) was the artist's widow. She had asserted title to the paintings by survivorship and excluded them from the estate account. Plaintiff Louis Bernstein, who filed the petition commencing the contest in the administration proceeding, was the artist's father. He died August 9, 1969, after the settlement, and one of his sons, Aaron (the father's executor), has been substituted as plaintiff in the present rescission action.

Throughout the administration proceeding, including all settlement negotiations, both parties were represented by experienced members of the District of Columbia Bar: James A. Earnest for the plaintiff, and I. S. Weissbrodt for the defendant. After substantial pretrial litigation and shortly before trial, counsel negotiated a settlement that was then agreed to by their clients. Defendant paid plaintiff $50,000 in cash. Plaintiff executed a notarized release discharging defendant of "any and all manner of actions * * * [and] claims * * * both at law and in equity * * * by reason or means of any matter or thing from the beginning of the world to the day of the date of these presents." (Defendant's Exhibit 3.) Plaintiff's three adult sons, who had actively participated in the litigation, also agreed to the settlement and each executed a similar release. (Findings 67, 68, 69.) This suit to undo that settlement was commenced more than two years later, on December 16, 1966.

Morris Louis * was a so-called "vanguard artist." Prior to his death at age 49, his paintings were not in demand

---

* Morris Louis Bernstein's professional name, by which he will hereafter be referred.

and his relatively few sales were at modest figures. Reproductions of some of his work appear in the record. (Defendant's Exhibits 243, 244.) As a so-called modern artist, he was, of course, non-representational, preferring to appeal to the aesthetic through the interplay of color and abstract design. Morris Louis' work was largely unseen and unassimilated at the time of his death. There had been little public recognition of the artist's talent. He apparently had been completely engrossed as a painter, working long hours in a small room of his house in Washington, D. C. Some of his canvasses were apparently bigger than the room. He did not stretch his canvasses but placed canvass horizontally, sloping and folding to cause the paint to spread. He exploited liquidity of the paint, in effect dyeing the canvass to obtain effect. Highly experimental, he constantly tried varying techniques and color combinations during long periods of intense activity.

Morris Louis' output was prolific. There were approximately 577 canvasses rolled up and unsold mainly in the basement of his home at the time of his death. The size, quality, color and theme of these paintings varied markedly. Some canvasses when eventually stretched—the so-called giants—covered an entire wall (as much as 11 to 17 feet in one direction), and there were literally hundreds of these huge paintings. Others were smaller, presenting vertical or horizontal stripes, veils, elongated globules or splashes of color. Some canvasses were bright, some brown and dark. Some were clearly defined, others appeared worked over and more uncertain. The group included some paintings that Morris Louis himself had directed be destroyed, and many others that the dealers and critics most favorable to his work considered and continue to consider totally unsalable and unworthy of the painter's true talent. There were, of course, also a relatively small number of paintings that had particular aesthetic appeal for those who had an informed taste for modern art, and these proved highly salable once his best works gradually came to be in vogue after his death.

Obviously this type of collection raised difficult questions of valuation. Andre Emmerich of the Emmerich Galleries in New York, an early believer in Morris Louis and his agent for the United States before and after his death, made an appraisal of $164,000 at time of death. Emmerich reasoned that given the lack of substantial public interest in the painter, the difficult problems presented by the size and advanced taste of the paintings and wide variations in quality, the collection would bring the most if sold as a unit to a single buyer or syndicate. His valuation on this basis was accepted by the Internal Revenue Service. (Finding 37.)

The painter's widow was primarily interested in establishing her husband's reputation and acceptance as a painter and felt no immediate financial or other compulsion to flood the market with paintings following death by either a single sale of the collection or by numerous individual sales. She obviously needed advice and technical assistance and turned to obvious sources: Greenberg, an experienced modern art critic; art dealers Emmerich and the Rubins, who had each purchased some of Morris Louis' paintings and had an early appreciation of his competence as well as knowledge of the United States and foreign markets; and Weissbrodt, her lawyer. After careful study, this group decided that only some stripes of better quality had any apparent immediate market and some of these paintings were selectively offered and promoted by a posthumous show at the Emmerich Gallery. After examining some 300 giants, an effort was also made to use a selected few, again the very best, to interest prestige shows such as the Guggenheim and the Venice Biennale. Gradually some stripes and an occasional giant began to sell, often on consignment, at improved prices. This careful, slow and technically difficult process went forward, aided by significant fa-

vorable critical comment in newspapers and art publications, prior to and during the time the original lawsuit was pending.

The suit that led to the settlement here under attack was brought on April 2, 1964, many months after Morris Louis' death. The father and brothers, all of whom lived in Florida, knew little about the aesthetic or commercial aspects of modern art. They had not been in close contact with the painter's creative work during his lifetime. Perhaps, in belief that the paintings were virtually worthless, they at first accepted the widow's accounting, which did not list the paintings as an asset of the estate although they knew of their existence. However, rumors as to amounts received or being asked for particular paintings, and a sense that Morris Louis was apparently "catching on," ultimately sparked their interest in asserting the caveat against the administration. It is now suggested the Bernsteins were unsophisticated, uninformed relatives, easily misled. The documents and impressions gained at the trial do not bear this out. The testimony and numerous letters written by the Bernsteins show their financial astuteness, an ability to appreciate relevant facts, close attention to details and keen acquisitiveness.

Prior to settlement, plaintiff and his sons had information and rumors leading them to believe, among other things, that the paintings might have a value of as much as $1,500,000 if sold over a long term; that current asking prices were in the range of $10,000 to $12,000 a painting; that sales were going pretty well both in the United States and abroad, where a group had been sold for $30,000; that Morris Louis had become a nationally known artist whose works were being catalogued by the renowned art critic Greenberg and handled by the Emmerich Gallery in the United States and by the Rubins abroad; that there had been numerous magazine articles about Louis' talents and various exhibitions; that there had been a memorial exhibition at the Guggenheim Museum;

that Louis' income had supposedly skyrocketed before his death; and so forth. (Findings 11, 12, 15, 18–20, 29, 41 and 42.) Advice given by Earnest, who wrote careful, detailed letters covering all significant developments, were checked by other lawyers and accountants for the Bernsteins in Florida. They were given access to masses of data, including tax returns, appraisals and correspondence, all pursuant to a broad duces tecum subpoena in aid of discovery served on the widow and Weissbrodt prior to settlement. (Finding 41.)

If rescission is to be had there must be sufficient proof of misrepresentation and fraud or some breach of fiduciary duty shown. While the complaint in this matter has been amended on a number of occasions, the principal ground for the claim of rescission originally rested upon alleged misrepresentations claimed to be fraudulently made by Weissbrodt in his dealings with Earnest. These alleged misrepresentations concerned the value of the paintings which were the subject of the administrative proceeding. It is unnecessary to discuss misrepresentation in detail, for during trial these claims ultimately focused on a single letter, written by Weissbrodt on October 5, 1964, in response to Earnest's letter of September 30. Both these letters are annexed to the Stipulation of Facts. In his letter of October 5, Weissbrodt stated that while he did "not agree with the statements and assumptions" made by Earnest in reaching an estimate of $350,000 as the net value of the paintings, he was "willing as a premise for settlement purposes to entertain" that figure. Plaintiff contends that this statement was fraudulent in that Weissbrodt knew the $350,000 figure to be well below the actual value of the paintings, yet led Earnest to believe that the figure was a fair estimate. The Court is unable to accept this contention, for it is contrary to the facts and contradicted by common experience.

Here were two competent, knowledgeable, wary lawyers seeking to arrive at

an acceptable money figure which would terminate litigation troublesome to both parties. Earnest had concluded that he wanted $50,000 for the lawsuit, which he eventually got. He presented by his September letter certain factors which he felt supported this objective. Weissbrodt, sensing the trend of Earnest's thinking, was willing to accept certain of his stated premises in order to discuss and hopefully reach a settlement figure, but indicated his disagreement with those premises. He did not make any affirmative representations of value in doing this. It is common practice to approach settlement discussions in this fashion. The full purport of what was said and done between the two lawyers is not known, for Earnest is now dead and Weissbrodt was not questioned in detail about his informal discussions with Earnest. That there were other contacts than those revealed on the face of two letters is undisputed. Neither the widow nor Weissbrodt had any hard information, by way of authoritative opinion or otherwise, as to the value of the collection as a whole other than the estate valuation at time of death. Absent a duty to disclose on Weissbrodt's part—and there was none, a point discussed more fully below—there was nothing to compel him to reveal information bearing on the value of the collection, and he did not do so. He simply took a stance in the negotiations which reflected his unwillingness to settle at a higher figure, with the result that Earnest recommended to his client and finally accepted a settlement at $50,000 to avoid the uncertain outcome of a trial.

Plaintiff treats the question of the value of the paintings as though value were a fact known to Weissbrodt at all times and ascertainable by the simple mathematical process of multiplying the average price received for paintings already sold against the total number of unsold paintings at the time of death. This, of course, is a faulty assumption. The value of the paintings sold related only remotely to the value of the collection as a whole. By constant review and re-examination and a highly selective process, certain paintings had been placed in the market and for exhibition because of their unusually high artistic merit. The remaining paintings were inherently less valuable, many of them were totally unsalable and indeed others had been marked for destruction by the artist. All concerned recognized that to maximize the value of the collection, sales would have to occur over a long period, perhaps ten to fifteen years. Weissbrodt did, in a speculative way, indicate at an early stage of the administration suit that if the paintings continued to be carefully sold over many years and public taste did not change in the meantime the paintings might be worth $1,000,000. He stated this not as fact but as opinion. There is no indication whatsoever that he had any reason to believe at the time he gave this information or up until settlement that his statement was not wholly accurate as an opinion. He never modified or withdrew this and substantially less than this figure had been received from sale of the best paintings prior to settlement. This was not, therefore, a "statement of an opinion not actually held, or the reckless statement of an opinion by one with special knowledge" found to constitute fraud in Gsell v. Adams, 316 F.Supp. 394, 400 (D.Or.1969).

[redacted] The claim of misrepresentation here is doubly defective because it is, of course, essential to rescission not only that substantial misrepresentation be shown, but that the proof establish that the representations were relied on by the party seeking rescission. Plaintiff noticed the deposition of the father, Louis Bernstein, which was taken in the present case before his death. The deposition, signed by Louis Bernstein, is in evidence. From this transcript it appears, contrary to the present contentions of his sons, that he relied primarily on the Emmerich valuation in making the settlement and this valuation of $164,000 as of the time of death remains unimpeached and indeed is not seriously

challenged. To be sure, Emmerich's valuation might be somewhat on the low side since it was made for tax purposes, but this consideration was known to Louis Bernstein, the original plaintiff. No extended discussion of the law as to misrepresentation and fraud is required. The Court has examined the cases cited by both sides and feels that the controlling legal principles are well set out in such cases as United States v. Kiefer, 97 U.S.App.D.C. 101, 228 F.2d 448 (1956); Equitable Life Ins. Co. v. Halsey, Stuart & Co., 312 U.S. 410, 420, 61 S.Ct. 623, 85 L.Ed. 920 (1941); and see Clark v. Barlow, 74 U.S.App.D.C. 328, 122 F.2d 337 (1941).

As the case progressed, and perhaps in recognition of the insubstantial nature of the fraud and misrepresentation claims, plaintiff increasingly placed his primary reliance on a different theory. Plaintiff contends that under probate law the administratrix was obligated to make full disclosure of information in her possession concerning the prices being obtained for paintings sold during the period between the artist's death and settlement, or, at the very least, the aggregate amount received by the widow for the total number of paintings sold. It is urged that Weissbrodt, as attorney for the administratrix, was under a similar duty to disclose, and that the failure of either the administratrix or her attorney to reveal this information in the face of indications that Earnest, as the representative of Louis Bernstein, may well have been somewhat undervaluing the paintings, requires a court of equity to set the settlement aside.

There are a number of reasons, both factual and legal, why this contention must also fail. Throughout the negotiations plaintiff was well aware that Weissbrodt represented the administratrix in both her probate and individual capacity and that the widow had not included the paintings in the estate, firmly claiming title in herself by right of survivorship. Early in the litigation that preceded the settlement, Earnest, on behalf of the plaintiff, sought to obtain precise information concerning the price at which each painting had been sold or would be sold in the future. After full hearing before the United States District Court and pending review by the United States Court of Appeals, Weissbrodt was successful in obtaining a consent order which did not require disclosure of prices being paid for paintings. Defendant was acting in the interests of all concerned in seeking to conserve and enhance the value of the paintings. In an affidavit filed in May 1964 in the probate proceeding, Mr. Emmerich stated as follows:

> Because of the extreme delicacy which permeates the market in the early period of distribution of the work of an artist who has recently achieved recognition * * * art dealers maintain great confidentiality with respect to all aspects of the sale of paintings. *Prices are not disclosed, the number of paintings available for sale is not disclosed, and frequently, the names of purchasers are not disclosed even to the artist. These are the established trade customs in the art business.* (Plaintiff's Exhibit 2, p. 4) (Emphasis added).

As Earnest himself came to recognize, public disclosure of sales prices would seriously depress future sales of the paintings.

Plaintiff argues that, even if no duty to disclose existed while the issue of ownership was being litigated, a duty did arise when settlement negotiations began, since defendant was then negotiating for the purchase of Louis Bernstein's interest in the estate. The flaw in this argument is that defendant was purchasing not an interest in the estate, but an end to a lawsuit in which title to the paintings was still hotly contested and in which many variables besides value of the paintings had to be considered. Detailed findings (see Findings 46, 49, 50, 51, 56, 58, 61, 62) present these other factors and they need only be briefly mentioned here.

Louis Bernstein, the father, was in his late eighties and he obviously had a personal interest in obtaining funds before his death. He and the other brothers had consented to the initial report of the administratrix, withholding the paintings from the estate in favor of her individual claim, although they all knew that the paintings existed. It also appeared that Louis Bernstein had assigned his claim to others in order to defeat a possible claim by his wife, and that this assignment had not been filed in the probate proceedings. The brothers were, moreover, not acting in harmony, one brother accusing the others of fraud and threatening to initiate separate criminal and civil proceedings. Earnest also was concerned with the uncertainties inherent in the litigation, particularly if the issue ultimately came before a jury, in view of the many strong human factors which would operate in favor of the widow who had supported her impecunious husband, buying his paints and feeding him through her labors as a school teacher over a long period of time.

■ The Court has analyzed the authorities cited and is unable to find any decision or any canon of ethics which placed upon the administratrix or Weissbrodt an obligation to advise the plaintiff prior to settlement of amounts obtained from sales of individual paintings or any authoritative valuation of the paintings, even if there was one, which could have been passed on. The question of value was always speculative and remains speculative today. All of the parties were aware of this and there is no rule of law which necessitated any disclosure beyond that which was made. Plaintiff's best case is Estate of Albright, 309 N.Y. 126, 127 N.E.2d 910 (1955), but that case does not stand for the proposition for which it is advanced. There the party seeking rescission of the settlement was entitled to share in what was acknowledged to be the property of the estate, if she could establish that she was the bona fide widow; the New York Court of Appeals decided only that

the claim of rescission could be heard and determined prior to trial on the merits of her claim against the estate.

■ The settlement in this instance was made by experienced attorneys and the courts have long recognized that arm's length disposition of litigation, particularly settlements made through counsel by sophisticated litigants, cannot lightly be set aside merely because subsequent developments may indicate that the bargain made proved more beneficial to one party than the other. It is not unusual in a rescission action for those seeking reopening of a settlement to rationalize objections and even to distort facts. This is such a case. Many of the positions now taken by the plaintiff's son Aaron cannot be said to be credible in the light of the documentary evidence and what the Court finds to be the wholly credible testimony of Weissbrodt. The two key individuals involved on plaintiff's side in the settlement, Louis Bernstein and his lawyer Earnest, are dead, thus illustrating the particular difficulties presented in an attempt to reopen a negotiated arm's length settlement under the impetus of hindsight and post-settlement rationalizations. The Court has entered judgment on behalf of the defendant and wholly exonerates Weissbrodt from the various shifting attacks on his integrity.

■ The Court considers this a completely unfounded suit and has concluded in its discretion that this is an appropriate case in which to award defendant attorneys' fees as well as certain out-of-pocket costs. The Court is well aware of the general rule that attorneys' fees will not be awarded as costs except in extraordinary cases. The reasons for this rule are fully discussed by the Supreme Court in Fleischman Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717–718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). This, however, is an extraordinary case.

From the beginning of this lawsuit, the allegations of fraud were unsupported by any evidence except a conviction

on the part of the Bernstein brothers that they had made a bad bargain in 1964. They nevertheless pressed the action over its long and tedious course. Utilizing lawyers retained on a contingent basis, they had little at hazard, and could afford to keep hoping against hope that something would turn up to support the serious charges of fraud and misrepresentation against attorney Weissbrodt. The complaint was amended three times to reflect altered theories of the action or other developments. In the end, the case rested on a novel legal theory that could readily have been presented at the outset without the wearing, time-consuming, expensive pretrial activity which is so graphically shown by the jacket of this case. Defendant had 20 court appearances prior to trial; there were 15 depositions taken outside of Washington generating, with one deposition in Washington, 2,183 pages. Defendant's counsel logged 3,388 hours and their work included 709 pages of correspondence and 1,122 pages of legal and factual memoranda. By unsuccessfully resisting discovery, the brothers made it necessary to take their depositions twice. These and related facts are fully developed in an extensive affidavit of attorney William D. Rogers and need not be further elaborated.

There are other factors to be considered. The defendant was not deposed, called as a witness nor shown to have given Weissbrodt any directions or instructions. Rather, she is depicted on this record as one who, confronted with lawsuits by her husband's relatives, placed her confidence in a recognized member of the bar and proceeded thereafter as he in his professional judgment suggested. In short, she did nothing but seek and follow legal advice. For having done this and defended an unfounded suit she faces substantial legal fees well above the amount she paid to settle the original litigation. On the other hand, the plaintiff has only some out-of-pocket expenses. This shocks the conscience, given the nature of the suit.

There is ample authority for the award of counsel fees in equity cases such as this. In Sprague v. Ticonic National Bank, 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939), the Supreme Court stated: "Allowance of [counsel fees and other expenses not included in ordinary taxable costs] in appropriate situations is part of the historic equity jurisdiction of the federal courts." *See also* Gazan v. Vadsco Sales Corp., 6 F.Supp. 568 (E.D.N.Y.1934):

> This court in an equity action has inherent power to grant an additional allowance of costs as between client and solicitor. Such costs may be awarded where fraud and misconduct have been charged, and not sustained when the suit was brought without any basis and was vexatious and oppressive.

In Cleveland v. Second National Bank & Trust Co., 149 F.2d 466 (6th Cir. 1945), cert. denied, 326 U.S. 775, 66 S.Ct. 231, 90 L.Ed. 468 (1945), appellant had charged the trustee of an estate with fraud, a charge which the court had determined to be "utterly unfounded." Substantial counsel fees were allowed the trustee as costs. In affirming this award, the Sixth Circuit noted: "It is common experience that charges of mismanagement and fraud against fiduciaries will speedily blast the best reputations, and it is also common experience that once destroyed they may not easily be restored." 149 F.2d 466, 470. The same might be said for charges of fraud and breach of fiduciary obligation against an attorney.

Defendant was ably and conscientiously represented by highly competent counsel. Their normal time charges for some 3,388 hours logged total $154,006, but they acknowledge that they will be forced to reduce this amount in any actual billing. It is difficult to set an hourly rate for attorneys who handled different phases of the case. A bare minimum charge for this time in the aggregate is $30 per hour, a figure well below the firm's normal time charges and one which experience suggests in-

volves no element of profit. Congress recently recognized this hourly rate as appropriate for appointed counsel in criminal cases. Public Law 91–447, October 14, 1970, amending 18 U.S.C. § 3006A. It represents the barest of minimums in today's economy. By adopting it as the standard in this case the Court will more than adequately adjust for any activities of defendant's counsel which involved duplication of lawyer's time or non-productive work, factors that may sometimes be present in a situation such as this although there is no indication of this in the proof. Approximately one-fifth of the time was logged prior to the time that a summary judgment motion of defendant was heard and denied by Judge Holtzoff. On this occasion plaintiff had full information on the true merits of the case and his representations to Judge Holtzoff which defeated the motion proved to be wholly without substance. Giving plaintiff the benefit of the doubt on the frivolity of his claim up to that time, the Court awards defendant four-fifths of the time logged for attorneys' fees at $30 per hour, or the sum of $81,310.

A final question is whether attorneys' fees should be assessed against the estate, against Aaron Bernstein individually and as executor of the estate, or against all three Bernstein brothers. The estate has no assets, and can meet only $5,000 covered by the cost bond. The money received in the 1964 settlement was transferred by Louis Bernstein to his sons by gift prior to his death well before this case came to trial. Aaron Bernstein, as executor of his father's estate, was thereafter substituted as plaintiff, and he with support from his brothers kept the suit alive solely for their own benefit. In this effort Aaron Bernstein took the prime responsibility. Without his acquiescence the suit could not have gone forward. Nathan Bernstein was somewhat active and testified at trial, while Joseph apparently took only a limited role. Nathan and Joseph are not parties to the suit, are not be-

fore the Court, and costs will not be assessed against them.

An executor of an estate may in certain circumstances be held personally liable for the costs of a lawsuit prosecuted by him in his representative capacity. In re Butler, 20 F.Supp. 995 (W.D.Va.1934), states the general rule to be that

> executors and administrators are not personally liable for costs of litigation conducted by them in good faith, as to transactions arising during the lifetime of their decedent, but may be so held liable where they act in an imprudent or ill-advised manner in conducting such litigation; * * *

20 F.Supp. at 999. In accord with this decision are Singer v. Singer, 196 S.W. 2d 938 (Tex.Civ.App.1946); Page v. Cave, 94 Vt. 306, 111 A. 398 (1920); and Lynch v. Webster, 17 R.I. 513, 23 A. 27 (1891). It is thus both just and proper that the major burden of this lawsuit should fall upon Aaron Bernstein. The full amount of costs will be assessed against him both individually and as executor.

Only the following out-of-pocket costs will be allowed defendant, i. e., all amounts paid for one copy of any deposition or trial transcript; filing fees; witness fees; $800 for Florida counsel; and any transportation expenses incurred in attending out-of-town depositions noticed by plaintiff. Out-of-pocket costs totaling $12,477.12 are claimed. These are not itemized in sufficient detail but counsel can promptly determine the amount to be awarded in the light of the foregoing. Only costs of the type indicated above up to the face amount of the bond will be allowed for out-of-pocket costs. This amount should be promptly negotiated between counsel and incorporated in an order granting judgment for defendant on the merits, for attorneys' fees in the amount of $81,310, and for out-of-pocket costs computed as herein set forth. The $50,000 rescission bond shall stand and not be released until final order in this case following whatever appeal, if any, is taken.