727 F.2d 1405
 CENTRAL STATES STAMPING COMPANY, Plaintiff-Appellee, Cross-Appellant,
v.
TERMINAL EQUIPMENT COMPANY, INC., et al., Defendants,
and
Lake County National Bank, Now known as Bank One of
Northeast Ohio, N.A., Defendant-Appellant, Cross-Appellee.
 Nos. 82-3166, 82-3206.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 30, 1983.
Decided Feb. 21, 1984.
 
 Harry T. Quick, argued, Cleveland, Ohio, Joseph J. Magri, Painsville, Ohio, for defendant-appellant, cross-appellee.
 Jeffrey Embleton, argued, Mansour, Gavin, Gerlack & Manos, Cleveland, Ohio, for plaintiff-appellee, cross-appellant.
 Before LIVELY, Chief Judge, JONES, Circuit Judge, and BROWN, Senior Circuit Judge.
 LIVELY, Chief Judge.
 
 
 1
 This appeal and cross-appeal are from the judgment in a diversity action which was a companion case to Melamed v. Lake County National Bank, 727 F.2d 1399 (6th Cir. No. 82-3205), decided this date.
 
 I.
 
 2
 The appellee Central States Stamping Company (Central States) contracted to purchase a "slitting line"--a machine which takes a wide coil of steel as it comes from a steel mill and cuts it to narrow widths and recoils it for further processing--from Terminal Equipment Company, Inc. (Terminal) in January 1977. Prior to making the decision to purchase, Wayne Scheer, president of Central States, talked with the two principal officers of Terminal, Simpson and Jackson. During a meeting at the Bedford, Ohio plant of Terminal on December 14, 1976, Terminal made a proposal for building a slitter to the specifications and at a price which was agreeable to Central States. Scheer then requested information about Terminal's financial capabilities and was told that "they were working extremely closely with their bank." In fact, Terminal was heavily indebted to Lake County National Bank (the Bank), which had assumed a supervisory role over Terminal's day-to-day management. Terminal referred Scheer to Jim Martin, vice-president of the Bank, for additional information.
 
 
 3
 About the middle of January 1977, Scheer called Martin at the Bank. At trial Scheer testified that he was satisfied with the engineering ability of the principal people at Terminal, but had "some concern for their financial strength." Scheer testified as follows concerning his telephone conversation with Martin:
 
 
 4
 I told him that we were a small company, trying to grow, but we couldn't afford a loss, which was the reason I was calling him, because I wanted to be very certain of the financial capability of Terminal Equipment Company.
 
 
 5
 I asked him--specifically, I can remember two areas that I zeroed in on. I asked about the integrity of the principals, the chief executives, of Terminal Equipment Company. And I asked if they maintained their word. That is the thing that is very important to me, as a businessman, do they say what they are going to do, look you in the eye and tell you the truth. That was one of the areas that I focused in on.
 
 
 6
 * * *
 
 
 7
 * * *
 
 
 8
 I asked him specifically about that. He indicated--I mean, his response to everything that I asked him was positive.
 
 
 9
 The second thing I asked him--number one, I asked him about their integrity. The second thing I said is, do they maintain their commitments to the bank.
 
 
 10
 Q. And his response? A. I can't recall his exact words, but he gave me a positive response.
 
 
 11
 Q. Did he say anything else in the phone conversation? A. I recall I tried to probe--I mean, I'm a probing type person. I tried to--you know, asked him some more questions. I don't recall what they were, but I--there was a point there that he kind of cut me off, or didn't cut me off, but just-- it was a one way--I wasn't getting any response from him.
 
 
 12
 So, again, you know, the things that were important to me were the integrity and the commitment, the fact that, you know, I asked him specifically do they maintain their commitments to the bank.
 
 
 13
 * * *
 
 
 14
 * * *
 
 
 15
 Q. Do you recall anything in your conversation with Mr. Martin that was negative about Terminal Equipment A. This is hazy, but I believe the fact--the one word that I can remember--I took some notes later--was the fact that they were undercapitalized, which again didn't mean a whole lot to me because that's why they had a banking relationship. That's why I was borrowing $475,000. If I had the money, I wouldn't have to go to the bank, myself. So most small businesses are in this position.
 
 
 16
 Q. Was there anything in your conversation with Mr. Martin which led you to believe that there was any financial stability problem with Terminal Equipment? A. No, other than the only negative, again, I think, that was said was about the undercapitalization of the company. But as far as whether or not they were late on their loan or anything like that, he didn't bring that up.
 
 
 17
 Q. Did he indicate to you what Lake County National Bank or Terminal Equipment would do with the down payment that you sent in? A. No, he didn't tell me.
 
 
 18
 The agreed price of the slitter was $200,000 and Central States sent a check for $30,000 to Terminal on January 21, 1977. Scheer testified at trial that he understood that this payment would be used to pay for labor and materials, and equipment, for his machine. On March 25, 1977, after a visit to Terminal's plant to check on the progress of the Central States slitter, Scheer sent Terminal a first progress payment of $20,000. About one month later Robert Jackson advised Scheer that Terminal had closed its doors. It developed that the Bank had applied the $30,000 payment to reduce Terminal's debt to it. The $20,000 payment was deposited by Simpson, the president of Terminal, in a different bank and used to pay his attorney and for other personal expenses. Terminal neither delivered the machine nor repaid the $50,000. It was adjudged a bankrupt in August 1977.
 
 II.
 
 19
 In its complaint as amended Central States alleged that it made the decision to purchase a slitter from Terminal and paid $50,000 of the purchase price in reliance on representations made by the Bank that "Terminal was maintaining a satisfactory credit relationship with the Bank and was trustworthy." Central States charged that the representations were false, known to be false, and were made for the purpose of inducing Central States to place the order and make the payments. Central States also pled that the representations were negligently made and were made with disregard for the truth, but it did not request instructions on negligence. At the conclusion of the plaintiff's case the Bank made a motion for directed verdict. In denying the motion the district court stated:
 
 
 20
 I think there is enough evidence for them to infer that Mr. Martin intended to mislead Mr. Scheer and there is evidence from which the jury could conclude that Mr. Scheer had a right to rely on the representation and that there was injury directly resulting from that reliance.
 
 
 21
 I think there is enough evidence, with respect to the second question, that a jury could reasonably come to the conclusion that once involved with the initial contract and the initial payment of $30,000, the additional $20,000 loss was geared to the original contract. I am not suggesting the jury can't decide otherwise and look at Mr. Simpson as an intervening cause, but there is certainly evidence here from which they could come to that conclusion.
 
 
 22
 The jury returned a verdict for $50,000 in favor of Central States and the Bank appeals. Central States cross-appeals from the district court's refusal to instruct on its claim for punitive damages.
 
 III.
 
 23
 The Bank contends that the district court committed reversible error in denying its motion for a directed verdict and submitting the issue of fraudulent misrepresentation to the jury. This argument has two facets: first, that there was no concealment; and, second, that a finding of fraudulent misrepresentation cannot be based on expressions of opinion. With respect to the concealment issue the Bank's position is that a failure to disclose facts is not fraudulent misrepresentation in the absence of some duty to disclose. It becomes concealment only when there is a duty to come forth with information. The Bank relies principally on Klott v. Associates Real Estate Co., 41 Ohio App.2d 118, 322 N.E.2d 690 (1974). In Klott, purchasers of real estate sought recovery from the sellers and a real estate agent who failed to disclose that the property was served by a water well rather than by the city water system. Klott sets forth the elements of fraudulent misrepresentation and acknowledges that fraud may be committed by suppression or concealment of information as well as by express falsehood. It holds that the relationship of buyer and seller of real estate does not impose a duty to disclose matters concerning the property which are neither purposefully hidden nor latent and incapable of being observed and inspected. The Bank relies also on Talcott v. Henderson, 31 Ohio St. 162 (1877), which holds that an insolvent purchaser of goods is not liable for fraud in not informing the vendor of his insolvency in the absence of a showing that the purchaser had fraudulent intent not to pay for the goods.
 
 
 24
 A more recent decision of the Supreme Court of Ohio appears to us to be more pertinent to our inquiry than those relied on by the Bank. Miles v. McSwegin, 58 Ohio St.2d 97, 388 N.E.2d 1367 (1979), also involved a claim that purchasers of real estate were not informed of a defect--termites in this case. After noting that an action for fraud may be based on the failure of a party to a transaction to fully disclose facts of a material nature where there is a duty to speak, the court discussed the duty to speak:
 
 
 25
 3 Restatement of Torts 2d 119, Section 551, subsections (1) and (2), states, in essence, that a party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another pary [sic] to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading. See Id., at Comment h to subsection 2(c) and Illustrations 1 and 2 thereto, at page 122; cf. Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co. (1941), 312 U.S. 410 [61 S.Ct. 623, 85 L.Ed. 920]; Fruit Dispatch Co. v. Wolman (1925), 125 Me. 355, 128 A. 740.
 
 
 26
 Id. at 100, 388 N.E.2d 1367. The court then pointed out that the presence of termites was not detectable by the purchasers upon reasonable inspection and affirmed the judgment in their favor.
 
 
 27
 Martin knew that Terminal was in default on two loans with the Bank and that its financial position was shaky. This information was not disclosed to Scheer though Scheer told Martin he wanted to be "very certain of the financial capability" of Terminal. He asked Martin specifically whether the principal officers of Terminal were people of integrity and whether they maintained their commitments to the Bank. Martin gave positive responses to both questions. It is clear that Martin did not fully disclose facts of a material nature, given the purpose of Scheer's call. Our inquiry narrows, then, to the question of whether Martin had a duty to speak.
 
 
 28
 The duty to speak does not depend on the existence of a fiduciary relationship between the parties. It may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence. See Smith v. Patterson, 33 Ohio St. 70, 75-76 (1877). Martin knew Terminal had suggested that Scheer direct his inquiries to the Bank because of the close working relationship between the company and the Bank. Scheer made it quite clear that Terminal's financial condition was a matter of prime importance to him as he contemplated entering into a major contract with the manufacturer. In short, Martin knew that his responses were likely to induce Central States to act or refrain from acting with respect to Terminal's proposal. Under Restatement of Torts, Second, Sec. 551, adopted by the Ohio Supreme Court in Miles v. McSwegin, supra, we believe that once Martin undertook to advise Scheer with respect to Terminal's financial condition he had a duty to disclose information in his possession which would reasonably be considered material to the decision he knew Scheer was in the process of making. Martin knew that Scheer had confidence in his knowledge about Terminal. His positive answers were likely to induce Central States to accept Terminal's proposal. Failure to disclose Terminal's true financial position made his previous positive responses misleading at least.
 
 
 29
 The Bank argues that this rule is unworkable and would "dry up" normal communications from banks which are essential to the functioning of the economy. Such a result is not inevitable. In an English case which was similar to ours, Hedley Byrne & Co., Ltd. v. Heller & Partners, Ltd., [1964] A.C. 465, 486, Lord Reid pointed out that a banker who receives an inquiry about the credit-worthiness of a customer has three courses open. The banker can decline to give the information; he can give an answer with a clear qualification that it is given and accepted without any responsibility or is given without reflection or research; or, the banker can give an answer without qualification. Lord Reid concluded that if a banker adopts the third alternative he can be held to have accepted some responsibility for answering carefully or to have accepted a relationship with the inquirer which requires him to exercise such care as circumstances require.
 
 
 30
 Hedley Byrne was not a fraud case but involved a negligent answer by a banker. However, it dealt instructively with the duty to speak once a relationship is established in which the person questioned knows that the inquirer is relying on the fact that he, the person questioned, has superior information. The duty is particularly clear when the party answering the inquiry benefits directly from the actions of the inquiring party. Here the Bank was able to apply $30,000 to its debts which Central States asserts it never would have paid if it had known Terminal's true financial position. We conclude the evidence was sufficient to support a finding that Martin had a duty to speak and that he failed to disclose material information to Scheer.
 
 
 31
 With respect to the second prong of this argument, though much of what Martin told Scheer could be classified as his opinion rather than fact, it is clear that his response to the inquiry about Terminal's meeting its commitments to the Bank was one of fact. To give a positive answer to such a question at a time when two of Terminal's bank loans were in default was a misrepresentation of a past or present fact, not a prediction of future events. Further, where there has been a failure to disclose fully accompanied by a duty to speak, statements of favorable opinion may have the effect of lulling the inquirer into a less searching probe. This was not a case where liability was imposed solely because the Bank gave mere opinions. The district court did not err in denying the Bank's motion for a directed verdict.
 
 IV.
 
 32
 The Bank next asserts that it was entitled to a directed verdict, or at least an instruction on intervening cause, with respect to Central States' claim for recovery of its second payment. This $20,000 "first progress" payment was made more than two months after the telephone conversation between Scheer and Martin and immediately following Scheer's visit to the Terminal factory. In denying the motion for a directed verdict, the district court recognized that the jury might "look at Mr. Simpson as an intervening cause." This observation referred to the fact that the president of Terminal had not transmitted the $20,000 check to the Bank, but had used it for expenditures unrelated to the Central States order and had in fact appropriated a portion of it for personal expenses.
 
 
 33
 The district court ruled correctly in denying the motion for a directed verdict. The evidence did not preclude a finding that Scheer was still relying on Martin's statements when he made the second payment. However, there was an abundance of evidence from which it could be concluded that Scheer was no longer acting in reliance on his January telephone conversation when he made the March payment. He had been in direct contact with Terminal for two months and had just completed a visit to the Terminal factory. He felt that work on the Central States slitter had reached a point where a progress payment was due. In fact, Scheer testified on cross-examination that he was satisfied at that time that his original $30,000 payment had been spent by Terminal to perform that amount of work on the Central States order.
 
 
 34
 The Bank made a written request for a specific instruction that if a new, independent and unforeseeable act directly causes damage, the party creating the original condition is not responsible. In denying this request the district court stated that its proximate cause instruction covered the Bank's defense. The court charged the jury that the plaintiff must prove that he suffered damage as a proximate result of the misrepresentation and "[f]or damage to be the proximate result of fraud, it must be shown that but for the fraud such damage would not have occurred."
 
 
 35
 The Bank has directed us to no authority which holds that a separate instruction of intervening efficient cause was required in this action for fraud. The bank cites Bradley v. Cleveland Ry. Co., 112 Ohio St. 35, 146 N.E. 805 (1925), a negligence case. The doctrine of intervening cause has been developed as part of the law of negligence, but has no application to an action for fraud or deceit. The issue is one of reliance. As stated in Harper & James, The Law of Torts, p 7.13, at 583-84 (1956):
 
 
 36
 The usual principles of causation are applicable to the tort of deceit. It must appear that the defendant's tortious conduct has in fact caused the plaintiff damage which occurred in such a manner as to come within the rules of legal causation.... The problem of legal or proximate causation is of little difficulty in view of the general rule that all intended consequences are proximate. Whether the defendant's misconduct has in fact caused plaintiff any damage at all, however, is frequently presented as a problem of "reliance" on the part of the plaintiff upon the misrepresentation.
 
 
 37
 If the jury believed that Central States did not reasonably rely on misrepresentations or omissions of the Bank in light of Scheer's own experience with Terminal it could have found for the Bank under the instruction on the elements of fraud and the "but for" language in the charge. Simpson's subsequent misappropriation of a portion of the second payment is not material to the inquiry. If Central States made the payment in reliance on the telephone conversation, this provided the opportunity for Simpson to misapply the funds.
 
 
 38
 The district court's instruction made it clear that Central States could recover damages only for those injuries which were proximately caused by the Bank's fraud. The "but for" test required the jury to determine whether each item of damage claimed was actually caused by the Bank's fraud. The Bank was free to argue that the evidence demonstrated that the $20,000 payment did not meet this test. It could argue that, even assuming fraud by the Bank in the telephone conversation between Scheer and Martin, the second payment was made in reliance on the experience of two months with Terminal and Scheer's satisfaction with the progress being made at the time of his March visit to the plant. If the jury accepted this view of the evidence it would have found that the damages suffered by Central States, to the extent of $20,000, were not proximately caused by the Bank's fraud.
 
 V.
 A.
 
 39
 The Bank also complains of other alleged errors in the instructions. We find no merit in its arguments. Where the Bank contends there was error in the district court's failure to give requested instructions we find that the issues were adequately covered. We believe also that the evidence supported the district court's charge that the jury could find for Central States on the basis of the Bank's having exclusive or superior knowledge concerning Terminal's financial condition. It is clear that the Bank's knowledge was superior to that of Central States, and it could be inferred that some details of Terminal's financial condition were known only to the Bank, given the tight control which it had assumed over Terminal's financial operations.
 
 B.
 
 40
 In its cross-appeal Central States contends that the district court erred in granting a directed verdict on its claim for punitive damages. Under Ohio law punitive damages are allowed only when a plaintiff has suffered actual damages as a result of fraud which is aggravated, that is, it is "malicious, deliberate, gross or wanton." Logsdon v. Graham Ford Co., 54 Ohio St.2d 336, 339, 376 N.E.2d 1333 (1978). When there is no evidence that the defendant's actions were motivated by actual malice, it is error to submit the question of punitive damages to the jury. Miles v. Perpetual Savings & Loan Co., 58 Ohio St.2d 93, 96, 388 N.E.2d 1364 (1979). There was no evidence that Martin or the Bank acted out of actual malice toward Central States in withholding material information after accepting a relationship which required full disclosure. Accordingly, the district court did not err in refusing to submit the issue of punitive damages to the jury.
 
 
 41
 The judgment of the district court is affirmed on appeal and cross-appeal. No costs allowed on appeal.