[No. E034787. Fourth Dist., Div. Two. Feb. 14, 2005.]

LEASE AND RENTAL MANAGEMENT CORP., Plaintiff and Appellant, v. ARROWHEAD CENTRAL CREDIT UNION, Defendant and Respondent.

**Counsel**

Holland & Knight and Vito A. Costanzo for Plaintiff and Appellant.

Moore, Brewer, Jones & Tyler, Duane Tyler and Christopher A. Beyer for Defendant and Respondent.

OPINION

GAUT J.—

## 1. Introduction

What legal duty does a credit union have when responding to a credit inquiry about one of its members, received from a party with no prior relationship to the credit union? We hold that, while a legal duty may exist if the credit union undertakes to make a response, in this instance, no material disputed facts prevented the trial court from granting summary judgment in favor of defendant Arrowhead Central Credit Union.

In March 1998, plaintiff Lease and Rental Management Corporation, doing business as "Auto Loan," first contemplated loaning money to Michael and Nanette Maloof, doing business as National Fleet and Lease Services. Three times Auto Loan asked defendant Arrowhead for credit references. In March 1998, October 1998, and December 1999, Arrowhead responded that the Maloofs had satisfactory credit. After the Maloofs filed for bankruptcy in April 2001, Auto Loan suffered losses of about $900,000. Auto Loan then sued Arrowhead and the Maloofs for fraud and negligence. The substance of Auto Loan's claim against Arrowhead is it provided false or misleading credit references, causing Auto Loan to extend credit to the Maloofs.

Based on two separate motions, the trial court ultimately granted summary judgment in favor of Arrowhead. Auto Loan appeals, challenging the court's ruling on the second amended complaint's second cause of action for fraud and deceit and sixth cause of action for negligence.

## 2. Factual and Procedural Background

The facts, as we summarize them, are not disputed except where noted.

Until their bankruptcy in 2001, the Maloofs operated a wholesale automobile business. Starting in 1996, they maintained a savings account, business checking account, and a line of credit with Arrowhead.

In March 1998, Auto Loan submitted a "Credit Reference Request" to Arrowhead. The spare one-page form had separate sections for responding about the checking account, savings account, and credit relationship. In a single introductory paragraph, the form announced: "Your firm's name has been furnished as a credit reference for the customer whose name and address appears below. We would appreciate any information you could provide

regarding this customer's credit history with you. We assure you that any information provided will remain confidential and will be used only by our credit department."

Joanna Avalos, an Arrowhead information specialist, completed the form. As to the checking account, for average balance, she checked the boxes "low" and "five" figures. For "experience," she checked "satisfactory." As to the savings account, she checked the box for "low" average balance and, for "number of NSFs or returns," she wrote "NA" or not applicable. She described an approved unsecured credit line of $200,000 as satisfactory.

In October 1998, Auto Loan submitted a different one-page request to Arrowhead. It contained the same introductory paragraph. Barbara Gronek, an Arrowhead credit analyst, completed the form. She described the Maloofs' deposit accounts, checking and savings, as "generally satisfactory," rather than "excellent" or "satisfactory." The secured credit line and loan was "generally satisfied" but approved credit was listed as only $18,500. Gronek admitted the latter figure was an error.

In December 1999, Sylvia Jiminez, a clerk in Arrowhead's commercial lending department completed a third credit reference, again containing the introductory paragraph, for the Maloofs, stating that payment was usually received in 30 days and the account was satisfactory.

Auto Loan contends that, based on Arrowhead's credit references, in April 1998, it entered into a loan and security agreement with the Maloofs and, in February 2000, Auto Loan purchased $500,000 of commercial paper issued by the Maloofs. By June 2000, Auto Loan had extended credit of $900,000 to the Maloofs. In November 2000, Arrowhead returned 16 bad checks written by the Maloofs totaling $231,196.15 to Auto Loan. Auto Loan claims ultimate losses of $899,945.75.

In June 2001, Auto Loan filed a first amended complaint against Arrowhead for various causes of action based on fraud. In February 2003, Arrowhead filed a motion for summary judgment directed at all five causes of action of the first amended complaint.

In response, Auto Loan filed a motion for leave to amend its complaint by adding three causes of action for negligence and constructive fraud.

In opposition to Arrowhead's summary judgment motion, Auto Loan filed a responsive statement of facts in which it asserts that, despite the generally positive nature of the credit references given by Arrowhead about the Maloofs' credit union accounts, they had 1,396 "NSF" checks (i.e., checks drawn on accounts with insufficient funds) in 1998 and 954 NSF checks in 1999. Arrowhead regularly allowed the Maloofs to operate with large overdrafts while charging them NSF fees. In October 1998, the Maloofs' checking account showed a negative monthly balance of $485,517.23. In February 1999, an Arrowhead senior vice-president, Anne Benjamin, wrote a memorandum stating she was "extremely concerned" about the account and threatening to close it. The response of Dan Jiminez, the account supervisor, was that the Maloofs' business had increased so rapidly it had caused an increase in the overdrafts. Nevertheless, Arrowhead asserted that the Maloofs were satisfactory business customers because they always made deposits sufficient to cover their checks.

Then, and later in opposition to the second summary judgment motion, Auto Loan submitted another separate set of facts, mostly disputed by Arrowhead, the gist of which was that Arrowhead supplied inaccurate credit references in spite of the Maloofs' poor credit history and that Arrowhead did not have adequate policies to cover giving credit references.

Whereas Arrowhead contended in its motion it did not know specifically why Auto Loan was making credit inquiries, Auto Loan insisted Arrowhead had to know Auto Loan was planning to grant credit, maintain existing credit, or expand existing credit.

Arrowhead also contended the facts did not show actionable reliance by Auto Loan and that Auto Loan did not diligently perform its own credit investigation and inquiry about the Maloofs. Auto Loan disagreed and accused Dan Jiminez, who was personal friends with the Maloofs, of assisting the Maloofs improperly. Auto Loan further maintained Arrowhead was trying to protect its own investment by keeping the Maloofs solvent with Auto Loan providing financing.

In April 2003, the court granted Auto Loan leave to file the second amended complaint and granted Arrowhead's original summary judgment motion as a summary adjudication of all causes of action of the first amended complaint.

Arrowhead then filed a demurrer, a motion to strike, and a second summary adjudication motion, attacking the remaining allegations of the second amended complaint. The court's ruling on those motions decided the balance of the case.

In connection with Arrowhead's second summary motion, Auto Loan tried to submit evidence, in the form of an expert declaration from William Gormley, that Arrowhead should have considered the number of NSF checks generated by the Maloofs when it gave them a satisfactory credit reference. According to Gormley, in banking parlance "satisfactory" means a customer generates few or no overdrafts and Arrowhead should not have given the Maloofs a satisfactory credit reference. Therefore, according to Auto Loan, there exists a factual dispute about whether the credit references were false and misleading. The court, however, refused to consider the Gormley declaration. Auto Loan also tried to present a plethora of evidence to show it could not have and did not need to conduct an independent investigation of the Maloofs' creditworthiness that might have discovered they were not a good credit risk.

Auto Loan presented additional evidence that, in April 1999 and April 2000, Jiminez approved without proper authority a $500,000 line of credit for the Maloofs and that Arrowhead made a practice of allowing the Maloofs to operate with substantial overdrafts. Some Arrowhead employees acknowledged the credit references were not accurate. Arrowhead also gave inaccurate credit references to other Maloof creditors.

In finding in favor of Arrowhead, the trial court ruled there was no evidence Arrowhead acted fraudulently and its opinion when supplying credit references was not actionable negligence. On appeal, Auto Loan contends Arrowhead had a duty to be accurate when responding to credit inquiries.

## 3. Discussion

The appellate court conducts a de novo review of the trial court's ruling on a summary judgment motion, viewing the evidence in the light most favorable to Auto Loan as the losing party, liberally construing Auto Loan's evidentiary submissions, and strictly scrutinizing Arrowhead's own evidence in order to resolve any evidentiary doubts or ambiguities in Auto Loan's favor. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].) The appellate court uses the same three-step analysis as the trial court: identify the issues as framed by the

pleadings; determine whether the moving party has established facts negating the opposing party's claims and justifying judgment in the movant's favor; and determine whether the opposition demonstrates the existence of a triable issue of material fact. (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252–1253 [32 Cal.Rptr.2d 223, 876 P.2d 1022].)

The two claims Auto Loan seeks to revive on appeal are the second cause of action for fraud and deceit and the sixth cause of action for negligence. The same factual allegations support the two causes of action.

█ Negligent misrepresentation, a form of deceit, occurs under California law where the defendant makes false statements without reasonable grounds for such belief. (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 487, 488 [275 P.2d 15].) Although there is apparently not any California law precisely on point, many cases from other jurisdictions involve liability for giving inaccurate credit information, some of which find liability and some of which do not, but most of which depend on specific facts for their outcome. (Annot., Liability of Bank, to Other Than Party Whose Financial Condition is Misrepresented, for Erroneous Credit Information Furnished by Bank or Its Directors, Officers, or Employees (1977) 77 A.L.R.3d 6, 30–43, §§ 3 and 4, and later cases (2004 supp.) pp. 3–5.)

Auto Loan begins with section 552 of the Restatement Second of Torts: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

Auto Loan then relies primarily on three foreign cases to support its claims. In *Central States Stamping Company v. Terminal Equipment Company Inc.* (6th. Cir. 1984) 727 F.2d 1405, before paying $50,000 for equipment to Terminal, Central States asked Terminal's bank to give an opinion about Terminal's financial stability. The bank vice-president responded positively, without disclosing that Terminal was in debt to the bank and the bank had a supervisory role over Terminal's day-to-day management. The court found the bank had no duty to speak but, having undertaken to do so, the bank should not have misrepresented Terminal's financial situation as better than the bank knew it was. Furthermore, the bank did not offer opinions but factual statements that were likely to mislead Central States. (*Id.* at pp. 1408–1409.)

In another case, *Berkline Corporation v. Bank of Mississippi* (Miss. 1984) 453 So.2d 699, Berkline sold furniture on credit to Furniture City based on a bank officer's written statement that Furniture City had an active line of credit in the low-six-figure range and a checking account with average balances in the low-five-figure range. The officer also stated Furniture City was a satisfactory account and the principals displayed sound business judgment. After Furniture City went bankrupt, Berkline learned the information given by the bank officer was incorrect. The Mississippi Supreme Court held there could be "a right of recovery upon proof of negligent misrepresentation of material facts reasonably relied upon to the detriment of plaintiff . . . ." (*Id.* at p. 700.) More fully, it explained: "Where a bank, through one of its duly authorized officers or agents, undertakes to supply credit information, arguably gratuitously, the bank and its officers are bound to use the skill and expertise which they hold themselves out to the public as possessing. There is ordinarily no reason why factual information given by the bank should not be accurate. When a bank officer makes representations or omissions of material facts false at the time, and where that officer has not exercised reasonable care and diligence to see that the information dispensed is accurate, the bank may incur a liability." (*Id.* at p. 702.)

Finally, in *R.A. Peck, Inc. v. Liberty Federal Savings Bank* (1988) 108 N.M. 84 [766 P.2d 928], the bank assured Peck, a contractor, that a construction loan was fully funded for building a ski resort when, in actuality, both the bank and the builder were disbursing the construction funds for other purposes. The court quite understandably held on these facts there could be liability: "Specifically, we believe the Bank owed a duty to [Peck] to disclose that the loan funds had been exhausted at the same time the Bank was telling [Peck] to submit all pay requests directly to it for processing and payment. Implicit in the Bank's statement to [Peck] was the assumption that there were, in fact, available loan funds from which [Peck] could be paid. Although the Bank may not have had an initial duty to disclose the status of [the builder's] account, once it affirmatively involved itself, vis-a-vis [Peck], in the capacity other than as a money lender, it had a duty to disclose material facts concerning the account. [Citations.] Depletion of account funds, as in this case, constitutes a material fact. This result is all the more compelling because the Bank stood to benefit directly from [Peck's] continued construction in the form of enhanced mortgage collateral. As [Peck] continued with the construction and improvement of the property, the Bank's financial position, with respect to the collateral, likewise improved." (*Id.* at p. 91.)

Using the principles expressed in the Restatement Second of Torts and these cases, Auto Loan argues Arrowhead should be liable for not disclosing all information about the Maloofs' account. We disagree.

First, in contrast to the cases cited by Auto Loan, other cases have found no liability. In *Park & Tilford Import Corp. v. Passaic Nat. Bank & Trust Co.* (1943) 129 N.J.L. 436 [30 A.2d 24], the court rejected the imposition of liability on the bank based on the argument it should not have reported a depositor's account as satisfactory when there was reason to question the depositor's creditworthiness. That court, and other courts, recognized the inherent subjectivity of an opinion like "satisfactory." (See also *First Trust & Sav. Bank v. Fidelity-Philadelphia Trust Co.* (3rd Cir. 1954) 214 F.2d 320; *Davanzo v. Miami Nat. Bank* (Fla. 1974) 301 So.2d 797; *A.S.C. Corp. v. First Nat. Bank* (1960) 241 Ind. 19 [167 N.E.2d 460]; *Banco Urquijo, S.A. v. Signet Bank* (3rd Cir. 1994) 861 F.Supp. 1220.)

Furthermore, two of Auto Loan's three primary cases are factually distinguishable. In *Central States* and *Peck*, the financial institutions supplying the credit references were deeply involved in the business and management of their customers unlike the present case in which the facts do not show that Arrowhead occupied anything other than a traditional banking role for the Maloofs. *Berkline* is more similar but it involved a detailed response to a credit inquiry that afforded a greater basis for the imposition of liability than Arrowhead's cursory responses in this instance.

In the present case, the inadequacy of the credit reference request forms used by Auto Loan is the root of the problem. These skeletal documents are poorly drafted, ask for very little information, and give no explanation as to the purpose of the credit inquiry. Arrowhead's incorrect representation that the category of "NSF" was not applicable to the Maloofs was certainly attributable to its misplaced location under "savings account" rather than "checking account" on the March 1998 credit request. Furthermore, there are institutional guidelines available that propose a credit "inquiry should specifically indicate its purpose and the amount involved" because "[a]n important element of an inquiry is its purpose. The bank receiving the inquiry has a right to know why the information is needed. Knowing and understanding the purpose of an inquiry places the recipient in a better position to respond with the type and amount of information needed to satisfy the inquirer." (Robert Morris Associates, *Principles for the Exchange of Commercial Credit Information* (2000) The Risk Management Association, <http://www.rmahq.org/RMA/AboutRMA/RMABylaws/practices.htm> [as of Feb. 14, 2004].) Here, Auto Loan sought information in a general way without offering any explanation about what was required and why. What Auto Loan received in return was sketchy and possibly inaccurate. But the original fault surely lay with the method of inquiry not the responses.

Turning to the responses themselves, we take up Auto Loan's claim that Arrowhead acted fraudulently or negligently. The evidence demonstrates that three different lower-level Arrowhead employees, not Dan Jiminez, completed the credit inquiry forms. The Arrowhead employees did not supply detailed information, which was not requested in any case. Instead, they checked off boxes or circled a response provided on the form. Auto Loan did not persist in its inquiry and ask for any better or different information. There is simply no fraud evidenced by these facts.

As to negligence, Auto Loan maintains that the Maloofs' credit performance did not qualify as "satisfactory" or "generally satisfactory." But, although there is evidence that the Maloofs maintained almost continuous overdrafts, the evidence also demonstrates they were never truly in financial difficulties until November 2000, almost a year after Arrowhead gave Auto Loan the third credit reference. The seemingly large number of annual overdrafts in 1998 and 1999 was actually small, less than .002 percent of the volume of checks processed by Arrowhead for the Maloofs. The Maloofs' performance satisfied Arrowhead except for the one instance in which Benjamin voiced her concern but ultimately took no further action. When Arrowhead insists the Maloofs were satisfactory customers, there is little in the record to contradict that contention.

We recognize Auto Loan asserts such contrary evidence was supplied by the Gormley declaration and it was error not to admit it. Even if it had been admitted, however, we would reach the same conclusion. Having reviewed the declaration, we do not find it to be sound evidence because it speaks in broad generalities and does not explain what purportedly are "the standards that govern responses to credit reference requests [and] require that a financial institution provide a more accurate response when there are overdrafts in the account." As such, Gormley's declaration does not succeed in supplying evidence of disputed material facts sufficient to defeat Arrowhead's motion.

### 4. Disposition

In summary, we conclude both parties erred. Auto Loan was not careful in its manner of inquiry. Arrowhead may have been too summary in its responses. But overall, there is no basis for liability when a credit union gives its subjective opinion about the creditworthiness of its customer and that opinion is not demonstrably false.

We affirm the judgment in favor of Arrowhead and award it costs on appeal.

McKinster, Acting P. J., and Ward, J., concurred.