[Cite as *Jack Turturici Family Trust v. Carey*, 196 Ohio App.3d 66, 2011-Ohio-4194.]

IN THE COURT OF APPEALS OF MIAMI COUNTY, OHIO

| | | |
|---|---|---|
| JACK TURTURICI FAMILY TRUST et al., | : | C.A. CASE NO. 10-CA-32 |
| Appellants, | : | |
| | : | T.C. CASE NO. 08-CV-1057 |
| v. | | |
| | : | (Civil Appeal from |
| CAREY ET AL., | : | Common Pleas Court) |
| Appellees. | : | |

. . . . . . . . .

O P I N I O N

Rendered on the 19th day of August, 2011.

. . . . . . . . .

James I. Weprin, for appellants and cross-appellees Jack Turturici, Janyce Turturici, and the Jack Turturici Family Trust.

Joshua A. Koltak and Michael A. Staudt, for appellees and cross-appellants Lostcreek Leasing Company, Eric Carey, and Kimberly Carey.

Alan A. Biegel, for appellee Real Living Realty Services, Inc.

Jeremy Tomb, for appellee Daniel Bagi.

. . . . . . . . .

**GRADY, Presiding Judge.**

{¶ 1}  This appeal concerns a contract to purchase commercial real property located at 701 N. Market Street in Troy ("701 property") and a contract to purchase adjacent, residential real property located at 703 N. Market Street ("703 property").

{¶ 2}   The Jack Turturici Family Trust owns commercial property in several states. Jack Turturici is the trustee of the Turturici Family Trust and is an experienced real estate broker licensed in the state of California.   Janyce Turturici is married to Jack Turturici.

{¶ 3}   Lostcreek Leasing Company owned the 701 property.   Eric M. Carey and Kimberly L. Carey owned Lostcreek.   The Careys themselves owned the 703 property. Pursuant to a March 19, 2005 lease, Lostcreek rented the 701 property to Ruth Alrick.   The five-year lease between Lostcreek and the tenant required initial monthly rent payments of $3,000 that subsequently increased to $3,800 per month, beginning April 1, 2006, and continuing until the end of term of the lease, March 31, 2010.

{¶ 4}   In March 2008, Turturici contacted Lostcreek's agent, Daniel Bagi, a real estate agent employed by Real Living Realty Services, Inc., regarding a potential purchase of the 701 property.   Bagi had listed the 701 property on the Loop Net System, which is accessible via an Internet website.   The Loop Net System provides commercial real estate listings to investors.   The commercial listing from Loop Net for the 701 property showed a "cap rate" of 9.00 percent.   This cap rate informed investors that the owners of the 701 property received $3,800 in monthly rental income from the property.   Turturici reviewed this Loop Net listing and was aware of the 9 percent cap rate.

{¶ 5}   Although the Loop Net listing for the 701 property showed a cap rate consistent with a tenant who was paying $3,800 per month in rent to the owners of the property, the tenant at the 701 property was in fact not making timely rental payments as of March 2008.   Rather, the tenant had begun falling behind in her rental payments in December 2007.   Therefore, the 9 percent cap rate was incorrect.   Bagi was not aware that the tenant

was behind in rent when he created the Loop Net listing in March 2008.

{¶ 6}   On May 6, 2008, the Turturici Family Trust entered into a contract with Lostcreek to purchase the 701 property for $451,050.   The inspection addendum to contract to purchase gave the Turturici Family Trust 30 days "to review all leases, rent rolls and financial data furnished by [Lostcreek] with respect to the Property."   The Turturici Family Trust did not exercise that right.

{¶ 7}   Paragraph 8 of the contract to purchase the 701 property provided that "Seller represents that * * * (c) no notices have been received from any public agency with respect to condemnation or appropriation, change in zoning, proposed future assessments, correction of conditions or other similar matters * * *.   These representations shall survive the closing." The closing was scheduled for August 15, 2008.

{¶ 8}   At a May 14, 2008 meeting at the 701 property, Turturici asked Bagi about the tenant, and Bagi told Turturici that the tenant was a "good tenant."   Turturici also asked Bagi and Eric Carey whether there was anything else he should know about the 701 property and the tenant, and they responded in the negative.

{¶ 9}   May 12 or May 14 was the date when Bagi first discovered that the tenant was delinquent in paying her rent.   In a May 15, 2008 e-mail from Eric Carey to Bagi, Carey asked Bagi, "Also, did you find out anything about disclosing to [Turturici] about the rent?" Kimberly Carey testified that Bagi told her that if they disclosed the tenant's rental history to Turturici, "it could kill the deal."   Despite Bagi's knowledge in May 2008 that the tenant was behind in rent payments, Bagi neither corrected the Loop Net listing nor informed Turturici about the incorrect cap-rate listing.

{¶ 10} On June 25, 2008, Bagi e-mailed to Turturici the 2005 and 2006 IRS 8825 forms reporting income received from the 701 property. The Careys also handwrote the estimated 2007 figures on the copy of the 2006 Form 8825. The estimated 2007 numbers showed gross rents of $50,640 and net rental real estate income of $17,958. Bagi did not alert Turturici that the tenant had been behind in rent payments since December 2007.

{¶ 11} The Turturici Family Trust obtained a loan from Eaton National Bank to finance the purchase of the 701 property. Daniel J. Daugherty, a commercial lender for Eaton National Bank, testified that the bank "likely would not have made the loan" if it had known that the tenant was not paying rent or was in arrears. A July 15, 2008 e-mail from Bagi to Daugherty stated, "The rent is now $3800/month." Bagi did not alert Daugherty that the tenant was in fact behind on these rental payments.

{¶ 12} On July 25, 2008, the Turturici Family Trust entered into a contract with the Careys to purchase the 703 property for $115,000. A handwritten note on an addendum to the contract to purchase the residential property stated, "This contract is contingent on the successful sale and closing of the property located at 701 N. Market St. to the same purchaser."

{¶ 13} On August 1, 2008, Deborah J. Swan, city engineer for the city of Troy, sent a notice to Kim Carey at Lostcreek that stated: "It has come to our attention that stormwater from your property at 701 N Market Street is flowing onto an adjacent property * * *. You must review your stormwater management plan for your property and provide improvements that will eliminate the overflowing to adjacent properties as soon as possible." The Careys told Bagi about the letter from the city on about August 3, 2008. Neither Bagi nor the Careys

told Turturici about the letter.

{¶ 14} By early August 2008, the tenant was about five months behind in her rent. On or around August 12, 2008, the tenant executed a promissory note for approximately $20,000 in favor of Lostcreek in lieu of her unpaid rent. Neither Bagi nor the Careys revealed this fact to Turturici.

{¶ 15} On August 14, 2008, the Turturici Family Trust executed promissory notes in the amount of $338,250 in favor of Eaton National Bank and in the amount of $53,000 in favor of Lostcreek to finance the purchase price of the 701 property. Both promissory notes were secured with mortgages on the 701 property. Further, the Turturicis personally guaranteed the $53,000 promissory note with Lostcreek.

{¶ 16} The sale of the 701 property closed on August 15, 2008, but the sale of the residential property never closed. The Turturici Family Trust received one rent payment from the tenant at the 701 property in September 2008. The tenant made no further payments under the lease and moved out of the 701 property. The Turturici Family Trust also stopped making payments to Lostcreek on the $53,000 promissory note and mortgage on the 701 property.

{¶ 17} On December 4, 2008, Turturici, as trustee for the Turturici Family Trust, commenced an action against the Careys, Bagi, and his employer, Real Living Realty Services, Inc., making claims for breach of contract, fraudulent misrepresentation, and fraudulent nondisclosure. Lostcreek successfully moved to intervene in the action. The Careys and Lostcreek filed counterclaims against the Turturici Family Trust and Jack and Janyce Turturici, seeking payment on the $53,000 promissory note and foreclosure of the

mortgage on the 701 property.

{¶ 18} On July 26, 2010, following a trial, the trial court issued its decision on the claims and counterclaims, finding (1) in favor of defendants Bagi and Real Living Realty Services, Inc. on the Turturici Family Trust's claims against them, (2) in favor of Lostcreek in the amount of $53,000 plus interest on its breach-of-contract claim against the Turturici Family Trust from the failure to pay the promissory note secured by the mortgage on the 701 property, (3) in favor of the Turturici Family Trust and against Lostcreek in the amount of $29,015 for breach of contract on the drainage issue referred to in the August 1, 2008 letter from the city, (4) in favor of the Turturici Family Trust on Lostcreek's counterclaim for breach of contract regarding the failure to purchase the 703 property.

{¶ 19} On October 10, 2010, the trial court entered a decree for judgment, foreclosure, and sale relating to the 701 property. After a setoff of the $29,015 award to the Turturici Family Trust, the court granted a judgment for Lostcreek and against the Turturici Family Trust and Jack and Janyce Turturici in the amount of $23,985, plus interest and court costs. The trial court ordered the 701 property sold. The property was subsequently sold at a sheriff's sale.

*Appeal of the Turturici Family Trust and the Turturicis*

FIRST ASSIGNMENT OF ERROR

{¶ 20} "The trial court erred by misapplying Ohio law on fraudulent misrepresentation."

SECOND ASSIGNMENT OF ERROR

{¶ 21} "The trial court erred by misapplying Ohio law on fraudulent nondisclosure."

{¶ 22} "A claim for common-law fraud requires proof of the following elements: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury   proximately caused by the reliance."   *Sutton Funding, L.L.C. v. Herres*, 188 Ohio App.3d 686, 2010-Ohio-3645, at ¶ 49, citing *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167,   169; *Collins v. Natl. City Bank*, Montgomery App. No. 19884, 2003-Ohio-6893, ¶ 39.

{¶ 23} The trial court found that the Turturici Family Trust could not establish the first element of its fraud claims because the trust failed to identify a fraudulent misrepresentation made by the defendants Lostcreek, the Careys, or Bagi.   According to the trial court, the only obligation the defendants had was not to misrepresent the "status," meaning the existence and terms, of the lease between Lostcreek and the tenant at the 701 property, which was in fact disclosed to the Turturici Family Trust.   Based on a review of the record before us, we do not agree that this was defendants' entire obligation.

{¶ 24} In *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 101, the Ohio Supreme Court explained a party's duty to disclose facts within the context of business transactions:

{¶ 25} "Ordinarily in business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to

the other. Pomeroy, Equity Jurisprudence (5 Ed. Symons Ed. 1941) 558, Section 904; Goldfarb, Fraud and Nondisclosure in the Vendor-Purchaser Relationship (1956), 8 West.Res.L.Rev. 5, 25. See, also, *Umbaugh Pole Bldg. Co. v. Scott* (1979), 58 Ohio St.2d 282, 12 O.O.3d 279, 390 N.E.2d 320. However, this court has recognized that in certain circumstances there exists a duty to speak. *Miles v. McSwegin* (1979), 58 Ohio St.2d 97, 100, 12 O.O.3d 108, 110, 388 N.E.2d 1367, 1369. For example, a party to a business transaction in a fiduciary relationship with another is bound to make a full disclosure of material facts known to him but not to the other. *Miles v. Perpetual S. & L. Co.* (1979), 58 Ohio St.2d 93, 12 O.O.3d 106, 388 N.E.2d 1364 (agent). See, generally, *Connelly v. Balkwill* (N.D.Ohio 1959), 174 F.Supp. 49, 11 O.O.2d 289. Such a duty may also arise out of an informal relationship where both parties to a transaction understand that a special trust or confidence has been reposed. *Umbaugh Pole Bldg. Co. v. Scott, supra,* paragraph one of the syllabus; *Stone v. Davis* (1981), 66 Ohio St.2d 74, 78, 20 O.O.3d 64, 67, 419 N.E.2d 1094, 1098; *Central States Stamping Co. v. Terminal Equipment Co.* (C.A. 6, 1984), 727 F.2d 1405. *Full disclosure may also be required of a party to a business transaction 'where such disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts.'* *Connelly v. Balkwill,* [174 F.Supp.] at 58, 11 O.O.2d at 296-297; *Miles v. McSwegin,* [58 Ohio St.3d] at 101, 12 O.O.3d at 111, 388 N.E.2d at 1369-1370 (real estate agent). See, also, 2 Restatement of the Law 2d, Torts (1977), Sections 551 and 529." (Emphasis added.)

{¶ 26} 3 Restatement of the Law 2d, Torts (1977) Section 551, cited in *Blon*, provides for "Liability for Nondisclosure":

**{¶ 27}** "(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

**{¶ 28}** "(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

**{¶ 29}** "(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

**{¶ 30}** "(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

**{¶ 31}** "(c) *subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so * * *.*" (Emphasis added.)

**{¶ 32}** Comment h to Section 551 of the Restatement provides:

**{¶ 33}** "One who, having made a representation which when made was true or believed to be so, remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him, is morally and legally in the same position as if he knew that his statement was false when made."

**{¶ 34}** Illustration 2 to Comment h to Section 551 provides:

**{¶ 35}** "A, the president of a mercantile corporation, makes a true statement of its financial position to a credit rating company, intending the substance to be published by it to

its subscribers. The corporation's financial position becomes seriously impaired, but A does not inform the credit rating company of this fact. The corporation receives goods on credit from B, a subscriber of the rating company, who when the goods are bought is relying, as A knows, on the credit rating based on his statements to the rating company. A is subject to liability in deceit to B."

**{¶ 36}** We believe the facts of the present case fall within the situation outlined in *Blon* and in Section 551 of the Restatement. The trial court found that Bagi did not willfully misrepresent the cap rate he first published on Loop Net when describing the 701 property. However, it is undisputed that the commercial listing on Loop Net for the 701 property showed a false, inflated cap rate of 9 percent. Although Bagi was not aware that the tenant was behind in rent when he first created the Loop Net listing, he conceded that he subsequently discovered in May 2008 that the tenant was in fact behind in rent payments, which rendered the 9 percent cap rate false. But Bagi did not inform Turturici of this information or correct the erroneous cap rate on the Loop Net listing prior to the August 15, 2008 closing on the 701 property. Turturici reviewed this Loop Net listing and stated that he relied on the 9 percent cap rate when making his decision to purchase the property.

**{¶ 37}** Further, in a May 15, 2008 e-mail from Eric Carey to Bagi, Carey asked Bagi, "Also, did you find out anything about disclosing to [Turturici] about the rent?" Kimberly Carey testified that Bagi told her that if they disclosed the tenant's rental history to Turturici, "it could kill the deal." Eric Carey testified to the same effect. This e-mail and testimony make clear that Bagi and the Careys (and therefore Lostcreek) intentionally withheld information from Turturici that would have dispelled "'misleading impressions that are or

might have been created by partial revelation of the facts.'" *Blon*, 35 Ohio St.3d at 101, quoting *Connelly v. Balkwill*, (N.D.Ohio 1959), 174 F.Supp. 49.

{¶ 38} Daniel J. Daugherty, a commercial lender for Eaton National Bank, testified that the bank "likely would not have made the loan" to Turturici if it had known the tenant was not paying rent or was in arrears. A July 15, 2008 e-mail from Bagi to Daugherty stated, "The rent is now $3800/month." Although at this time Bagi knew that the tenant was not timely making rent payments, he did not disclose this information to Daugherty or Turturici.

{¶ 39} Moreover, on June 25, 2008, Bagi e-mailed to Jack Turturici the 2005 and 2006 IRS form 8825s reporting income received from the property at 701 N. Market Street. The Careys also handwrote the estimated 2007 figures on the copy of the 2006 Form 8825. The 2005 Form 8825 showed gross rents of $23,630 and net rental real estate income loss of $16,799. The 2006 Form 8825 showed gross rents of $44,237 and net rental real estate income of $6,905.00. The estimated 2007 numbers showed gross rents of $50,640 and net rental real estate income of $17,958. Although Bagi was aware at the time he sent this e-mail to Turturici that the tenant was in fact behind on her rent payments, he did not disclose this fact to Turturici or clear up any misleading impressions that the tax information may have caused with respect to how much rent was actually being paid by the tenant.

{¶ 40} The trial court also found that the tenant at the 701 property became delinquent in her lease payments beginning in December 2007 and that by August 2008, she was about $20,000 in arrears to Lostcreek. Neither the Careys nor Bagi revealed this fact to Turturici before the August 15, 2008 closing on the 701 property. While it is true that Turturici did not specifically ask Bagi, the Careys, or the tenant whether the tenant was making timely rent

payments, we believe that this does not relieve defendants from liability on the fraud claims, given the other particular facts before us. Turturici did request financial information about rent payments by the tenant, and Turturici did review and rely on the Loop Net listing showing a cap rate that reported rental income much higher than what the tenant was actually paying to Lostcreek. Bagi and the Careys knew that Turturici wanted to know about the actual rental income but purposefully did not disclose information that they believed might "kill the deal." Even if Bagi was not aware that the cap rate was erroneous when he posted it in March 2008, it is undisputed that he became aware by May 2008 that his previous representations were false. He then had a duty to disclose that fact and the information Bagi learned about the tenant's late payments to Turturici. *Blon*, 35 Ohio St.3d at 101; Section 551 of Restatement 2d of Torts.

{¶ 41} The trial court erred in finding that the defendants did not make a material misrepresentation. The first assignment of error is therefore sustained. The parties disagree whether the remaining elements of fraud have been established. In its July 26, 2010 decision, the trial court did not address whether the remaining elements of fraud had been established. Therefore, on remand, the trial court must determine whether the remaining elements of fraud have been established.

THIRD ASSIGNMENT OF ERROR

{¶ 42} "The trial court erred by granting Lostcreek's counterclaim for breach of contract and foreclosure."

{¶ 43} Turturici argues that the trial court improperly granted judgment for Lostcreek on its counterclaim against the Turturici Family Trust for breach of contract, foreclosure of the

701 property, and personal guaranty on the note by Mr. and Mrs. Turturici, because the mortgage should have been avoided where the instrument it secured was obtained by fraud.

{¶ 44} As discussed in the first two assignments of error, the trial court erred in finding that defendants did not make any misrepresentations. However, until the trial court makes a finding on the remaining elements of the fraud claims, it would be premature for us to find that the mortgage and promissory note were procured by fraud and that the trial court therefore erred by granting Lostcreek's breach-of-contract counterclaim. Therefore, we do not reach the merits of this assignment of error.

{¶ 45} The third assignment of error is overruled.

FOURTH ASSIGNMENT OF ERROR

{¶ 46} "The trial court erred by disregarding Turturici's references to the trial in Turturici's posttrial brief."

{¶ 47} Plaintiff argues that the trial court improperly gave weight to defendants' posttrial briefs while disregarding plaintiff's posttrial brief. According to plaintiff, "[t]he trial court improperly refused to consider Turturici's references [to the transcript] because the 'transcript was never filed with the Clerk of Courts.'"

{¶ 48} On page one of its July 26, 2010 decision, the trial court stated:

{¶ 49} "The parties filed post-trial briefs on June 4th which the Court has also considered. The Plaintiff's post-trial brief referenced a transcript of the trial which had been requested by Plaintiff's counsel. Unfortunately (for the Court) this transcript was never filed with the Clerk of Courts and therefore references to it in the memorandum are not properly before the Court. Instead the Court will rely upon its own notes taken at trial."

**{¶ 50}** This statement by the trial court does not establish that the trial court failed to consider the Turturici Family Trust's posttrial brief or the arguments contained therein. Rather, the trial court specifically stated that it considered all of the parties' posttrial briefs. While the trial court stated that it did not have access to the trial transcript that was cited in the Turturici Family Trust's brief, the trial court did not say that, as a result of this lack of access, it would ignore the brief in its entirety, and we see no indication that the trial court in fact did so. The trial court could properly rely on its own notes.

**{¶ 51}** The fourth assignment of error is overruled.

*Cross-Appeal of Lostcreek and the Careys*

FIRST ASSIGNMENT OF ERROR

**{¶ 52}** "The trial court erred when it determined that Lostcreek breached its contract with trustee."

**{¶ 53}** An August 1, 2008 letter from Deborah J. Swan, city engineer for the city of Troy, to Kim Carey at Lostcreek Leasing Company stated: "It has come to our attention that stormwater from your property at 701 N Market Street is flowing onto an adjacent property. * * * You must review your stormwater management plan for your property and provide improvements that will eliminate the overflowing to adjacent properties as soon as possible."

**{¶ 54}** Prior to receiving the August 1, 2008 letter from the city, Kimberly Carey was aware that at times, water flowed from the 701 property onto a neighbor's property. The Careys made Bagi aware of the letter from the city on or about August 3, 2008. Neither the Careys nor Bagi alerted Turturici of the August 1, 2008 letter.

**{¶ 55}** The trial court made the following findings of fact regarding the parking lot

water:

**{¶ 56}** "Lostcreek knew of the overflow problem by virtue of Mr. Miller's complaints to them. Lostcreek blamed the City of Troy for the problem.

**{¶ 57}** "Lostcreek received a notice from the City of Troy before the closing of the commercial property regarding the need to keep their storm water run-off on their own property. They did not disclose this to the Plaintiff.

**{¶ 58}** "* * *

**{¶ 59}** "Mr. Turturici testified he observed the 2 x 2 drain grate but did not ask any questions about it when he inspected the property on May 14, 2008.

**{¶ 60}** "The Court concludes the fact that the retention basin fills with water after a heavy rain (which it is designed to do) is not a latent defect.

**{¶ 61}** "The Court concludes the fact that some of the excess water flows onto the Miller property before it drains away, should have been disclosed to the Plaintiff, by Lostcreek, even though Lostcreek was of the opinion the problem was the City of Troy's undersized storm-water system. Lostcreek also had an obligation to notify the Plaintiff of the letter it received before the closing, from the City of Troy regarding this issue."

**{¶ 62}** Lostcreek argues that the trial court erred in finding that Lostcreek should have disclosed to Turturici prior to the closing that water from the 701 property sometimes would flow onto the neighbor's property and that Lostcreek had received a letter from the city saying so. According to Lostcreek, there was no contractual duty to disclose any notices received after May 6, 2008, the date on which the contract to purchase the 701 property was signed. We do not agree.

{¶ 63} Lostcreek's argument is belied by the plain language of Paragraph 8 of the contract to purchase the 701 property, which provided:

{¶ 64} "Seller represents that * * * (c) no notices have been received from any public agency with respect to condemnation or appropriation, change in zoning, proposed future assessments, correction of conditions or other similar matters * * * . *These representations shall survive the closing*." (Emphasis added.)

{¶ 65} The words "These representations shall survive the closing" imposed a continuing duty on Lostcreek to inform Turturici of any relevant notices received between the date the contract to purchase was signed (May 6, 2008) and the date of closing on the 701 property (August 15, 2008). When Lostcreek failed to inform Turturici of the August 1, 2008 notice, Lostcreek breached its contract with the Turturici Family Trust.

{¶ 66} Lostcreek also argues that the trial court's finding that Lostcreek breached its contract with the Turturici Family Trust was against the manifest weight of the evidence. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.* (1978), 54 Ohio St.2d 279, at syllabus.

{¶ 67} The plain language of paragraph 8 of the contract to purchase the 701 property, along with the undisputed facts that the owners of Lostcreek received a notice to correct a condition of the 701 property and failed to disclose this notice to Turturici is competent, credible evidence supporting the trial court's finding that Lostcreek breached its contract with the Turturici Family Trust.

{¶ 68} The first assignment of error is overruled.

SECOND ASSIGNMENT OF ERROR

{¶ 69} "The trial court erred when it awarded damages to trustee for breach of contract."

{¶ 70} Lostcreek argues that the trial court erred in awarding damages to the Turturici Family Trust resulting from Lostcreek's breach of contract because Turturici "did not offer any evidence of a diminution in value of the Commercial Property. * * * When an injury to property is subject to repair, the preferred measure of damage is the cost of repair, unless the cost of repair exceeds the difference between the market value of the property in good repair and the market value as actually delivered with defects."

{¶ 71} The Turturici Family Trust responds that cost of repair is the correct measure of damages in a breach-of-contract case of this type. Further, the Turturici Family Trust argues that Lostcreek failed to make this argument before the trial court and that Lostcreek's own expert witness supported a cost-of-repair approach to damages for Lostcreek's breach of contract.

{¶ 72} Lostcreek did in fact make this argument to the trial court in its posttrial brief. Therefore, Lostcreek did not waive its right to assign error with respect to the formula by which the court awarded damages against Lostcreek on the breach-of-contract claim.

{¶ 73} The cost of repair is the correct measure of damages, unless the cost of repair exceeds the difference between the market value of the property in good repair and the market value as actually delivered with defects. According to Lostcreek, no evidence was presented at trial regarding the market value of the property in good repair and the market value as

actually delivered with defects. This evidence, however, is relevant only to set a cap on the amount of damages to which the Turturici Family Trust was entitled for Lostcreek's breach of contract. Being in the nature of a defensive matter, it was Lostcreek's burden, not the burden of the Turturici Family Trust, to persuade the trial court that the damages should have been capped at an amount lower than the cost of repair.

**{¶ 74}** Lostcreek also argues that the amount of damages awarded by the trial court was against the manifest weight of the evidence. Two witnesses, David Winemiller and Chad Reese, expressed opinions regarding the cost to correct the condition of the 701 property that was referred to in the August 1, 2008 notice from the city. Based on a review of the evidence of record, the trial court found:

**{¶ 75}** "While expert witness Reese testified his cost to correct the problem of water flowing onto the Miller property would be $23,795.00, this figure did not include permits, construction layout, etc. (Plaintiff's Exh. 40).

**{¶ 76}** "Winemiller testified the total cost of the project to correct this problem would be $29,015.00. The Court accepts this latter figure as the cost to correct the Miller property problem."

**{¶ 77}** We have reviewed the testimony of Reese and Winemiller. The testimony of Winemiller is competent, credible evidence supporting the trial court's damage award for Lostcreek's breach of contract. Therefore, the trial court's finding is not against the manifest weight of the evidence.

**{¶ 78}** The second cross-assignment of error is overruled. The judgment of the trial court is affirmed in part and reversed in part. The cause is remanded for further proceedings

consistent with this opinion.

Judgment affirmed in part

and reversed in part,

and cause remanded.

FROELICH and HALL, JJ., concur.